(No. 70352

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANDRE JONES, Appellant.

*Opinion filed September 19, 1991.*

246

Howard B. Eisenberg and James B. Roberts, of Carbondale, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn Kaplan, Solicitor General, and Terence M. Madsen and Nathan P. Maddox, Assistant Attorneys General, of counsel), for the People.

JUSTICE BILANDIC delivered the opinion of the court:

The defendant, Andre Jones, brings this appeal from an order of the circuit court of St. Clair County dismissing his second post-conviction petition. The defendant was convicted, pursuant to a plea of guilty, of three murders and was sentenced to death for each murder following a sentencing hearing before a jury. On direct appeal, this court affirmed all three of the defendant's convictions and two of the death sentences. The death sentence for the third murder conviction was vacated and the cause remanded for imposition of a sentence other than death. *People v. Jones* (1982), 94 Ill. 2d 275, 299-300.

Following his direct appeal, the defendant filed a petition for post-conviction relief in the circuit court of St. Clair County. In this petition, the defendant alleged that he did not receive the effective assistance of counsel at the guilty plea stage or during his original sentencing hearing. The circuit court dismissed the petition without an evidentiary hearing, holding that the defendant had waived the ineffective-assistance issue by failing to raise it on direct appeal. This court affirmed the dismissal of the post-conviction petition, noting that on direct appeal the defendant was represented by counsel other than the

allegedly ineffective trial counsel. Because the claim of ineffective assistance of trial counsel could have been raised on direct appeal, this court held that the defendant was barred from raising the claim in a post-conviction proceeding. *People v. Jones* (1985), 109 Ill. 2d 19.

The defendant then obtained new counsel and filed a second petition for post-conviction relief, which is the subject of the instant appeal. This second post-conviction petition alleged (1) that the defendant's trial counsel was ineffective; and (2) that the counsel who represented the defendant on direct appeal and in the first post-conviction proceeding was ineffective for failing to challenge the competency of the defendant's trial counsel. Following an evidentiary hearing, the circuit court denied the petition for post-conviction relief. The defendant appealed directly to this court (134 Ill. 2d R. 651).

The defendant's convictions stem from his participation in the murders of Richard Stoltz, Samuel Nersesian and Debra Brown on April 30, 1979. According to the defendant's statement to the police, he was walking with his girlfriend, Laurie Elem, and his codefendant, Freddie Tiller, when they saw a man, Richard Stoltz, loading bricks onto a truck. Tiller asked the defendant for the revolver that he was carrying, stating his intention to rob Stoltz. The defendant gave him the weapon and the two men approached Stoltz. As Stoltz raised his hands, Tiller shot him in the eye and took a watch, wallet and keys from his body. Tiller and the defendant then reunited with Elem and continued to walk toward the apartment the defendant shared with Elem. The defendant and Tiller stopped across the street from the apartment, near Illinois Cleaners, and Elem went home. The defendant then suggested that he and Tiller rob the cleaners and Tiller agreed. The two entered the store, where the defendant shot Samuel Nersesian, the proprietor, twice in the head. The defendant then opened the

cash register and took an undetermined amount of money. As they were about to leave, a postal mail carrier, Debra Brown, arrived in a mail truck and approached the cleaners. The defendant hid behind the door and grabbed Brown from behind as she entered the cleaners. He then pushed her into a storage room, where he shot her in the chest and in the mouth. The defendant and Tiller then left the store. Tiller left the scene in the mail truck and the defendant walked across the street to his apartment. Stoltz, Nersesian and Brown died as a result of their gunshot wounds.

Following his confession, the defendant was indicted for three counts of murder, three counts of armed robbery and three counts of armed violence. (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(a), 18—2(a), 33A—2.) At his arraignment, the defendant elected to plead not guilty and the St. Clair County public defender was appointed to represent him. Subsequently, the public defender withdrew due to a conflict, and Robert Gagen was appointed to represent the defendant. On the date set for trial, upon the advice of counsel, the defendant changed his plea on the three murder charges to guilty. His plea was accepted after the trial judge questioned him as to the voluntariness of his plea. The State then requested a death penalty hearing and the defendant elected to be sentenced by a jury.

At the first stage of the death sentencing hearing, a transcript of the plea colloquy between the defendant and the trial court was introduced without objection by the defense. Following the introduction of this evidence, the jury returned a verdict finding that the defendant had been convicted of murdering two or more individuals and had attained the age of 18 or more at the time of the offenses, and thus was eligible for the death penalty. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3).) At the second stage of the sentencing hearing, the State intro-

duced evidence of the defendant's significant history of criminal activity. The State's evidence included testimony that, in addition to the triple murder to which the defendant pleaded guilty, the defendant had also confessed to the gruesome murder of an elderly couple in East St. Louis. The defense rested without introducing any mitigating evidence. After deliberating for only 20 minutes, the jury returned a verdict finding no mitigating factors sufficient to preclude a sentence of death and the court sentenced the defendant to death.

As stated, the defendant alleges in his second petition for post-conviction relief that Robert Gagen, who represented him at the plea proceedings and at sentencing, was ineffective. He also claims that David Hoffman, who represented him on direct appeal and in the first post-conviction proceedings, was ineffective for failing to challenge the competency of Gagen.

## I.

## APPELLATE COUNSEL

We first consider the defendant's claim that Hoffman, his appellate counsel, was constitutionally ineffective in failing to challenge the competency of his trial counsel on direct appeal. The defendant argues that Hoffman was incompetent in failing to raise the ineffective-assistance claim on direct appeal. (*Strickland v. Washington* (1984), 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2065.) The defendant contends that Hoffman did not raise the ineffective-assistance issue, even though he believed that Gagen was ineffective, because he did not think that the evidence necessary to sustain that claim was contained in the trial record. Defendant claims that Hoffman should have known that he could supplement the record on direct appeal with affidavits supporting the ineffective-assistance claim. He also claims that

Hoffman had no strategic reason for not raising the ineffective-assistance claim on direct appeal.

It is unnecessary, of course, for this court to determine whether counsel's performance was deficient before examining whether the defendant suffered prejudice as a result of the alleged deficiencies. As the Supreme Court noted in *Strickland,* claims of ineffectiveness can often be disposed of on the ground that the defendant suffered no prejudice from the claimed errors, without deciding whether the errors were serious enough to constitute less than reasonably effective assistance. (*Strickland,* 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) The defendant here claims that he suffered prejudice because this court would have reversed his convictions and/or death sentences had appellate counsel challenged the competency of trial counsel on direct appeal. He claims that there is a reasonable probability that, but for Hoffman's unprofessional errors, the result on direct appeal would have been different. Thus, to determine whether the defendant was prejudiced by Hoffman's failure to raise an ineffective-assistance claim on direct appeal, we must consider whether such a claim would have been successful in this court. Specifically, we must determine whether the defendant was deprived of the effective assistance of counsel at the guilty plea stage or at the capital sentencing proceedings.

## II.

## TRIAL COUNSEL

### A.

### Plea proceeding

We initially consider whether the defendant's trial counsel was constitutionally ineffective at the guilty plea stage of the trial court proceedings. The general stand-

ard for determining whether a defendant has received the effective assistance of counsel at trial has two components: incompetence and prejudice. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064; *People v. Albanese* (1984), 104 Ill. 2d 504.) Although *Strickland* dealt with a claim of ineffective assistance of counsel in a capital sentencing proceeding, the same two-part standard is applicable to ineffective-assistance claims arising out of guilty plea proceedings. (*Hill v. Lockhart* (1985), 474 U.S. 52, 57, 88 L. Ed. 2d 203, 209, 106 S. Ct. 366, 369-70; *People v. Huante* (1991), 143 Ill. 2d 61, 67.) To satisfy the first prong of *Strickland* in cases such as this, where a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the defendant must show that his counsel's advice fell below an objective standard of reasonableness. The inquiry in such cases is not "whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson* (1970), 397 U.S. 759, 770-71, 25 L. Ed. 2d 763, 773, 90 S. Ct. 1441, 1448-49; see also *People v. Huante* (1991), 143 Ill. 2d 61, 68-69; *People v. Correa* (1985), 108 Ill. 2d 541, 549.

A defendant must also satisfy the "prejudice" prong of the *Strickland* standard in cases involving guilty pleas. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 697, 104 S. Ct. at 2068.) To show prejudice, the defendant must prove that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." (*Hill v. Lockhart*, 474 U.S. at 59, 88 L. Ed. 2d at 210, 106 S. Ct. at 370.) In this respect, the Supreme Court has observed:

"In many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Hill v. Lockhart* (1985), 474 U.S. 52, 59, 88 L. Ed. 2d 203, 210, 106 S. Ct. 366, 370-71.

In the present case, the defendant claims that he did not receive effective assistance of counsel in the plea proceedings and, consequently, did not make a voluntary, knowing and intelligent guilty plea. The defendant raises several arguments in support of this ineffective-assistance claim. He argues that his counsel was incompetent because he (1) did not adequately investigate the charges against the defendant or prepare the case for trial before advising the defendant to plead guilty; (2) failed to investigate the insanity defense; and (3) induced the defendant to plead guilty by advising him erroneously that the trial judge owed counsel a favor and would not sentence the defendant to death.

We first consider the defendant's contention that his counsel did not adequately investigate the charges against him or prepare the case for trial. The defendant raises a number of acts and omissions on the part of

counsel in support of this claim and we will address each instance of alleged neglect individually.

The defendant first points out that counsel did not file any motions or discovery requests prior to trial. The record, however, does not support the claim that counsel was negligent for failing to file such motions. As stated, the defendant was initially represented by an assistant public defender. Shortly after the defendant's arraignment, the assistant public defender filed standard defense motions, including motions for discovery, to suppress any confessions made to the police, and to suppress any witness identifications of the defendant. After filing these motions on behalf of the defendant, the public defender withdrew because of a conflict of interest and Gagen was appointed to represent the defendant. Although the record discloses that Gagen did not file any additional motions for discovery, it also shows that the prosecution complied fully with the discovery motions filed by the public defender and that no additional requests for discovery were warranted.

The defendant next contends that Gagen was incompetent because he did not argue the motion to suppress that the public defender filed on the defendant's behalf. The record reveals, however, that the public defender simply filed a standard, generalized motion to suppress which did not specifically refer to the factual circumstances surrounding the *defendant's* confession. Gagen testified at the post-conviction hearing that he spoke with both the defendant and the police officer who took the defendant's confession about the circumstances surrounding the confession, and concluded that there was no basis for pursuing the motion to suppress. Although the defendant argues that counsel's decision was unreasonable, he does not suggest any factual circumstance which Gagen overlooked that could have been raised at a hearing on the motion to suppress. We cannot conclude

that Gagen was incompetent in failing to pursue a suppression motion which appears to have had no merit. See *People v. Pirt* (1987), 164 Ill. App. 3d 379 (defendant who pleaded guilty pursuant to his counsel's advice was not deprived of the effective assistance of counsel based on counsel's alleged failure to review police records, where there was no evidence that counsel did not review police records or failed to discover facts which would have induced the defendant to persist in his not guilty plea).

The defendant also claims that Gagen failed to investigate the factual basis for the State's charges or any possible defenses to the charges. The record persuasively refutes this contention. Gagen testified at the post-conviction proceeding that he reviewed the investigative file of the prosecuting attorney, interviewed the woman who was with the defendant on the day of the crimes, spoke with the attorney representing the defendant's accomplice, and interviewed the police officer who took the defendant's confession. He also testified that he met with the defendant on numerous occasions. The defendant never denied committing the crimes with which he was charged and did not provide counsel with any information casting doubt upon the validity of his confession to those crimes. As the defendant readily concedes in this appeal, no *factual* defense to the charges existed.

Gagen testified at the second post-conviction proceeding that, when he realized that he could raise no factual defense to the charges, he considered raising two possible defenses predicated upon the defendant's mental state at the time of the offense: (1) inability to distinguish right from wrong due to the influence of narcotic substances and (2) insanity. Gagen testified that he abandoned the intoxication defense because the defendant repeatedly denied using any alcohol or drugs prior to committing the offenses in question. The defendant also told

the court psychologist, Cheryl Prost, and the trial court at the plea proceeding that he did not have a drug or alcohol problem.

The defendant claims, however, that his counsel did not adequately investigate the insanity defense. The defendant argues that, given the availability of information to support the insanity defense and the apparent lack of any other plausible defense, Gagen had a duty to obtain an independent psychiatric evaluation of the defendant's sanity before recommending that he plead guilty. The defendant points out that a subsequent psychological evaluation showed that the defendant's I.Q. score placed him in the "borderline retarded" range and that his I.Q. scores had declined over a number of years.

We must reject the defendant's claim that his counsel did not adequately investigate the insanity defense. Gagen admitted at the post-conviction hearing that the defendant specifically asked him to raise the insanity defense. Gagen testified, however, that after several interviews with both the defendant and the woman who was with the defendant on the day of the murders, he became convinced that the defendant was sane at the time of the offense. Gagen also testified that he contacted Cheryl Prost, a psychological consultant for the Twentieth Judicial Circuit who was counseling the defendant, to obtain her opinion on the defendant's mental state. Gagen testified that Prost informed him that she believed that the defendant was sane at the time of the offense and fit to stand trial. Gagen concluded, based on these interviews and on his experience as a public defender and as a judge in the criminal division of the circuit court of St. Clair County, that there was no basis for raising the insanity defense. Although defendant argues that Gagen should have requested an independent psychological evaluation of the defendant before advising the defendant to plead guilty, the record demonstrates

that the decision not to pursue the insanity defense was one of trial strategy made after reasonable investigation and based upon sound and experienced professional judgment.

Furthermore, evidence obtained after the defendant entered his guilty plea established that defense counsel's failure to investigate the insanity defense more thoroughly did not prejudice the defendant. To prove that he was prejudiced by his counsel's alleged incompetence, the defendant must show that further investigation of the insanity defense would have led Gagen to change his recommendation as to the guilty plea or that the insanity defense would have succeeded at trial. (*Hill v. Lockhart* (1985), 474 U.S. 52, 88 L. Ed. 2d 203, 106 S. Ct. 366.) Although the defendant claims that insanity was his only "viable" defense to the charges, the record persuasively demonstrates that insanity was not a "viable" defense.

Cheryl Prost, a psychological consultant, conducted an intensive psychological evaluation of the defendant immediately after he pleaded guilty to the three murders. Prost subsequently filed a four-page report of her findings in the trial court, which stated, in part:

> "[N]o pathology was found concerning psychosis or mental retardation nor significant substance abuse. What has been found is a very pathological personality disorder which has been present since childhood and which has not changed through the efforts of numerous state penal institutions. Mr. Jones [the defendant] has had poor control over his anger and impulsiveness as well as had little respect for the rights and lives of others."

Prost's report substantiates Gagen's professional judgment that the defendant was not insane at the time of the offense.

Gagen also requested and obtained a psychiatric evaluation of the defendant between the time the defendant pleaded guilty and the sentencing hearing. Gagen testi-

fied that, although he did not believe that a psychiatric evaluation of the defendant was warranted before the defendant pleaded guilty, he did request such an evaluation after the plea proceeding, because the defendant confessed to murdering an elderly couple in East St. Louis. Gagen testified that he asked the court to order a psychiatric evaluation because the defendant stated, in his confession, that he heard "voices" which told him to commit the murders. Pursuant to the trial court's order, the defendant was evaluated by Dr. Heinbecker, a psychiatrist. Dr. Heinbecker filed a report in the trial court which concluded that the defendant was sane at the time of the offense. Dr. Heinbecker's report also expressed skepticism over the defendant's reported hallucinations.

Thus, the evidence in the record demonstrates that further investigation of the defendant's psychological condition would have substantiated Gagen's conclusion that there was no basis for pursuing an insanity defense. Had counsel investigated the matter more thoroughly, he would have still recommended that the defendant plead guilty. The evidence also establishes that, had the defendant rejected this advice and gone to trial, he would not have succeeded in establishing the affirmative defense of insanity at trial. Thus, we conclude that the defendant has failed to establish either that his counsel was incompetent in failing to investigate the defendant's psychological condition more thoroughly or that the defendant suffered prejudice as a result of his counsel's failure to pursue an insanity defense. See *People v. Thompson* (1988), 166 Ill. App. 3d 909 (defense counsel's failure to further investigate the possible use of an insanity defense did not amount to ineffective assistance of counsel where record indicated that further investigation would not have revealed any evidence in support of insanity defense).

The defendant next complains that, on the date scheduled for trial, Gagen had not subpoenaed any witnesses to appear on the defendant's behalf and had not prepared any defense to the charges. Gagen admitted at the post-conviction hearing that he had not subpoenaed any witnesses to appear on the date set for trial. He explained, however, that all of the witnesses he anticipated presenting had voluntarily agreed to appear for trial and that subpoenas were therefore unnecessary. Trial attorneys often choose not to intimidate a willing witness with a subpoena, preferring instead to informally request the witness' presence at trial. (*Kubat v. Thieret* (7th Cir. 1989), 867 F.2d 351, 361.) Furthermore, the defendant does not identify any witnesses who he claims should have been subpoenaed but were not. In the absence of such evidence, we cannot say that failure to subpoena witnesses constituted deficient performance. *People v. Pirt* (1987), 164 Ill. App. 3d 379 (defendant was not deprived of the effective assistance of counsel based on counsel's alleged failure to review police records, where there was no evidence that police records contained facts which would have induced the defendant to persist in a plea of not guilty).

The defendant next claims that Gagen was deficient for allowing the defendant to enter a guilty plea without obtaining any concessions from the prosecutor. The defendant claims that Gagen did not even pursue the possibility of a plea bargain. Nothing in the record, however, supports this claim. The defendant did not ask Gagen at the post-conviction hearing whether he attempted to negotiate a plea bargain. Instead, counsel asked Gagen whether a plea bargain existed when the defendant entered his guilty plea and Gagen responded that there was no plea bargain to be made. Other evidence in the record suggests that Gagen attempted to negotiate a plea but was rebuffed by the State's Attorney's office.

At the plea hearing, the State's Attorney informed the court that he had told Gagen from the outset that the State would not dismiss any charges "nor were we going to fall short in presenting this case as a death penalty case and seek that penalty against the defendant."

As to the defendant's claim that Gagen was not prepared to offer a defense on the date set for trial, we find nothing in the record which supports this contention. Defendant's post-conviction counsel never specifically asked Gagen at the post-conviction evidentiary hearing what strategy he intended to pursue at trial. Gagen testified, however, that he had reviewed discovery, interviewed police officers and others with knowledge of the crimes, spoke with the defendant and the defendant's grandmother on numerous occasions, and conversed with the attorney representing codefendant Freddie Tiller. He testified that, although he did not anticipate that the defendant would defeat the charges, he was prepared to try the case on the date set for trial and would have proceeded to trial, had the defendant so desired.

The defendant next contends that Gagen improperly pressured him into pleading guilty by suggesting that the sentencing judge owed Gagen a favor and would not impose the death penalty. The defendant introduced the affidavits of his mother, his grandmother, and his former girlfriend in support of this claim. The affiants attested that they met with the defendant and Gagen on the date set for trial. They attested that the defendant stated that he did not want to plead guilty, but that Gagen informed him that if he entered a plea of guilty the judge would not impose the death penalty because the judge owed Gagen a favor. The defendant, his mother and his former girlfriend testified similarly at the post-conviction evidentiary hearing. The defendant argues that the evidence clearly establishes that his guilty plea was involuntary and the result of Gagen's erroneous advice that

Judge Hoban owed him a favor and would not impose the death penalty.

We note, however, that the evidence on this question was not undisputed. The record of the plea proceedings shows that, before accepting the defendant's plea, the trial judge questioned the defendant in open court as to whether his plea was obtained by coercion, threats or promises. The trial court also repeatedly warned the defendant that he could receive the death penalty for his crimes. The defendant specifically advised the trial court that no threats or promises had been made to induce him to plead guilty and that he understood that death was a possible sentence. The defendant nevertheless claims that his expectation that the death sentence would not be imposed was permissible, given the alleged assurances of his counsel. To accept the defendant's claim would require us to characterize the court's lengthy and exhaustive admonitions as merely a perfunctory or ritualistic formality; a characterization we are unwilling to make. (*People v. Robinson* (1987), 157 Ill. App. 3d 622, 628-29.) The court thoroughly questioned the defendant to determine that no promises or agreements had been made as to his sentence and that he understood the consequences of his guilty plea. The defendant repeatedly stated that he understood the consequences of his plea and reiterated his desire to plead guilty. The defendant's acknowledgment at the plea proceeding that he understood that death was a possible sentence and that there were no agreements or promises regarding his sentence contradict the petitioner's current assertion that he pled guilty in reliance upon his counsel's promise that he would not receive the death sentence.

This case is distinguishable from *People v. Morreale* (1952), 412 Ill. 2d 528, where this court held that the court's admonitions at the plea proceedings were insuffi-

cient to negate the effect of counsel's erroneous advice regarding the defendant's sentence. In *Morreale*, the court found several circumstances peculiar to the record, which led it to believe that the defendant's guilty plea was involuntary. These factors are not present here. The defendant in *Morreale* pled guilty to the charge of committing a crime against nature and was sentenced to a term of 5 to 10 years' imprisonment. The record demonstrated that the defendant initially pled not guilty to the charge and retained counsel to represent him. When the cause was called for trial, a "youthful associate" of the defense attorney appeared and asked that the matter be continued because defendant's counsel was engaged in the trial of another case. The prosecutor advised the court that the matter could be disposed of quickly and asked that the case be passed, rather than continued, while he spoke with the defendant's attorney. The prosecutor then sought out the defendant's counsel in another courtroom and suggested that the defendant plead guilty and seek probation. When defendant's counsel stated that he could not appear and dispose of the matter that day, the State's Attorney urged that counsel's associate appear on the defendant's behalf. Defendant's counsel acquiesced and his associate advised the defendant to plead guilty. When the defendant expressed doubts about following this course, he was taken to the other courtroom, where his retained counsel told him not to "worry about anything; plead guilty and you will get probation." (*Morreale*, 412 Ill. 2d at 530.) The defendant then returned to the courtroom, withdrew his plea of not guilty and entered a plea of guilty. Subsequently, the trial court denied probation and entered sentence as described above.

In holding that the defendant's guilty plea was involuntary, the court in *Morreale* relied upon unique facts not present here. Specifically, the court noted that the

hurried consultations between the defendant, his attorney, the "youthful associate" and the prosecutor, which took place during a recess of court by passing back and forth between two courtrooms, inevitably engendered confusion and misapprehension in Morreale. The court also noted that the pressure exerted by the prosecutor resulted in denying Morreale of representation by the actual counsel of his choice. The haste and manner in which the guilty plea was arranged led the court to believe that Morreale was induced to change his plea while confused. Considering all of the circumstances, including the fact that the prosecutor was the one who suggested that Morreale would not be harmed by pleading guilty, the court found that Morreale's guilty plea was not a "knowing and studied attempt to throw himself on the mercy of the court in a hope for milder punishment." *Morreale*, 412 Ill. 2d at 533.

Here, on the other hand, the defendant was not being represented by his counsel's "youthful associate." The State's Attorney was not advising or pressuring the defendant to plead guilty in return for a more lenient sentence. The defendant was not "induced to change his plea while confused and in a state of misapprehension." (*Morreale*, 412 Ill. 2d at 533.) Finally, the trial court's admonitions to the defendant under Supreme Court Rule 402 (73 Ill. 2d R. 402) were more comprehensive than those required in 1952 when Morreale pleaded guilty, and adequately ensured that the defendant was entering a voluntary guilty plea. (See *People v. Robinson* (1987), 157 Ill. App. 3d 622. Compare Ill. Rev. Stat. 1951, ch. 38, par. 732, with 73 Ill. 2d R. 402.) In sum, the record demonstrates that the defendant's guilty plea was not the result of counsel's alleged promise that the defendant would not receive the death sentence, but represented a " 'voluntary and intelligent choice among the alternative courses of action open to the defendant.' "

(*Hill v. Lockhart* (1985), 474 U.S. 52, 56, 86 L. Ed. 2d 203, 208, 106 S. Ct. 366, 369, quoting *North Carolina v. Alford* (1970), 400 U.S. 25, 31, 27 L. Ed. 2d 162, 168, 91 S. Ct. 160, 164.) The defendant here, unlike Morreale, made a knowing decision to throw himself on the mercy of the court in a hope for milder punishment. See *People v. Robinson* (1987), 157 Ill. App. 3d 622, 625-30.

Furthermore, Gagen's testimony regarding the events which transpired prior to the defendant's decision to plead guilty was not consistent with that offered by the defense witnesses. Gagen testified that he never specifically *advised* the defendant to plead guilty; he simply presented the options to the defendant and let the defendant decide whether to plead guilty. Gagen testified that he told the defendant that the evidence against him was very strong and that death was a possible penalty because the State's Attorney refused to make a plea bargain. He also testified that he was ready and willing to proceed to trial if the defendant so desired and that it was the defendant's idea to plead guilty. He conceded that the defendant decided to plead guilty after Gagen stated that he believed Judge Hoban was personally opposed to the death penalty and would not impose death if the defense offered any valid reason for not imposing it. Gagen explained:

> "[Gagen]: Well, we had many discussions, and I was very open, I thought [*sic*] with Mr. Jones, Andre, and told him that I had been a Circuit Judge here in St. Clair County and that for a number of years Judge Hoban [the trial judge] and I had worked very closely together and that I had known Judge Hoban for longer than the period of time that we had served as judges together. In fact, I had been a friend of his family and he of my parents for many years and that I knew that he was personally opposed to the death penalty and I explained to Andre that if we had any kind of chance, if we could give Judge Ho-

ban any reason not to impose the death penalty, I didn't think that he would."

The defendant responds that Judge Hoban was not personally opposed to the death penalty or reluctant to impose it in the defendant's case. The defendant points out that Judge Hoban specifically stated during the plea colloquy that the murder charges carried a possible penalty of death and that he "wouldn't hesitate to put [defendant] to death." Later in the same proceedings, Judge Hoban told the defendant: "[I]f there's any thought in your mind that by pleading guilty I might give you natural life, I want to erase that thought from your mind. Because if they prove the factors like in the commission of a felony crime described by the Statute as Armed Robbery being one of them, two murders being another one, I won't hesitate to sentence you to death." The defendant also notes that, several years after the defendant's sentencing proceeding, Judge Hoban did impose the death penalty in a bench proceeding.

The defendant argues that this evidence shows that Judge Hoban was not opposed to the death penalty and that there was no valid strategic reason for Gagen to urge the defendant to plead guilty. We disagree. The defendant has not demonstrated that Gagen's beliefs about Judge Hoban were incorrect. The fact that Judge Hoban sentenced another defendant to death several years after the defendant's sentencing hearing does not demonstrate that Judge Hoban would have imposed such a sentence at the time of the defendant's hearing. Moreover, Judge Hoban's statements to the defendant during the plea colloquy do not persuasively establish that he would have sentenced the defendant to death had the defendant elected to be sentenced in a bench proceeding. As stated, Judge Hoban was required under Supreme Court Rule 402 to advise the defendant of the nature of the charges against him and the minimum and maximum

sentences prescribed by law before accepting the defendant's guilty plea. (See 73 Ill. 2d R. 402(a).) Judge Hoban's statements regarding a death sentence may have been intended to impress the defendant with the gravity of his decision to plead guilty and to ensure that the defendant entered those pleas knowingly and voluntarily. Even if we construe the comments as expressing Judge Hoban's belief that the defendant's crimes warranted a death sentence, Gagen may have nevertheless believed that Judge Hoban would be persuaded by the defendant's expressions of remorse and would impose a more lenient sentence.

The defendant argues that there was no valid strategic reason for him to plead guilty, even if Judge Hoban was opposed to the death penalty. He argues that it would be improper for a sentencing judge to punish a defendant who exercises his right to trial more severely than one who pleads guilty. The post-conviction court rejected this claim, stating:

> "While this contention is unquestionably correct from a theoretical view point and while it would seem that no judge or jury would consciously punish such a defendant, people are not dispassionate machines and it is quite possible that, subconsciously, the sentencing entity would have reacted adversely to an 'audacious' assertion of nonguilt by a defendant who could not to any degree contest the evidence against him. We live in an imperfect world and experienced trial attorneys are aware of such imperfections."

The defendant insists that he did not benefit at all by entering a guilty plea, since he still received a death sentence. In considering whether Gagen was incompetent in advising the defendant to plead guilty, however, we must "eliminate the distorting effects of hindsight, *** and *** evaluate the conduct from counsel's perspective at the time." (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at

694, 104 S. Ct. at 2065.) We must also indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland,* 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

Although it is true that the defendant ultimately gained nothing by pleading guilty, the record persuasively demonstrates that the defendant had little to gain by insisting upon a trial. It is undisputed that the evidence against the defendant was overwhelming and that his chances of acquittal were minimal. The defendant had confessed to the crimes and ballistics evidence was available to prove that bullets from the defendant's gun matched those recovered from the victims' bodies. Confronted with the overwhelming evidence of the defendant's guilt, Gagen advised the defendant to plead guilty in the reasonable hope of obtaining leniency from the trial judge. Gagen may have reasonably believed that the trial judge would view the defendant's guilty plea as an expression of remorse warranting a less severe sentence than that imposed upon a defendant who protests his innocence in the face of overwhelming evidence of guilt. Moreover, by pleading guilty, the defendant avoided having the prosecutor inform the trial judge of all of the evidence available to establish the defendant's guilt. Instead, the trial judge simply heard the evidence necessary to establish a factual basis for the defendant's guilty plea.

When viewed from Gagen's perspective at the time he advised the defendant to plead guilty, we must reject the defendant's claim that such advice was outside the "range of competence demanded of attorneys in criminal cases." (*McMann v. Richardson* (1970), 397 U.S. 759, 770-71, 25 L. Ed. 2d 763, 773, 90 S. Ct. 1441, 1448-49.) The Supreme Court has recognized that the expectation or hope of a lesser sentence or the convincing nature of the evidence against the accused are considerations that

might suggest the advisability of a guilty plea. (*United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392; see also *Brady v. United States* (1970), 397 U.S. 742, 25 L. Ed. 2d 747, 90 S. Ct. 1463.) Here, counsel made a tactical decision that a guilty plea was in the defendant's best interest and advised the defendant accordingly. Gagen's strategy was to avoid the death sentence by asking for a bench sentencing hearing and having the defendant testify about his remorse for the crimes. Gagen testified that he spoke with the defendant on several occasions, believed his remorse was sincere, and thought he would make a good witness at the sentencing hearing. Thus, the record suggests that Gagen intended to use the defendant's guilty plea for tactical advantage at the sentencing hearing. "Generally, questionable trial tactics 'which arise[ ] from a matter of defense strategy will not *** support a claim of ineffective representation.' " (*People v. Holman* (1989), 132 Ill. 2d 128, 159, quoting *People v. Madej* (1985), 106 Ill. 2d 201, 214.) Trial counsel's informed strategic choices are virtually unchallengeable. (*People v. Steidl* (1991), 142 Ill. 2d 204.) We believe counsel's decision to advise the defendant to plead guilty was an informed strategic choice. Had counsel's strategy succeeded it is doubtful that it would now be argued that he was incompetent.

Unfortunately, Gagen's strategy for avoiding the death penalty was thwarted by several circumstances beyond his control. First, the defendant rejected Gagen's advice to have a bench sentencing hearing and insisted that his sentencing hearing be held before a jury. Second, the defendant refused to testify about his remorse for the crimes at the sentencing hearing; again, contrary to the advice of his counsel. Finally, Gagen was unaware of the defendant's involvement in the Wallace murders at the time he advised the defendant to plead guilty. Between the time of the plea proceedings and the sentenc-

ing hearing, however, the defendant gave a statement to the police in which he admitted that he forced his way into the Wallaces' home, stabbed the woman repeatedly in the neck, decapitated the man, and set the house on fire. The defendant also admitted that he took the man's head with him and had left it in the location where the skull was later found. The introduction of this evidence at the defendant's sentencing hearing severely diminished the defendant's chances of obtaining a lenient sentence. Although Gagen's strategy for avoiding the death penalty was thwarted, his decision to pursue that particular strategy cannot be deemed incompetent. A defendant is entitled to competent, not perfect, representation. Errors in judgment or trial strategy do not establish incompetence (*People v. Gaines* (1984), 105 Ill. 2d 79, 95) and trial performance is not to be judged by a hindsight perspective (*Strickland v. Washington* (1984), 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2065; see also *McMann v. Richardson* (1970), 397 U.S. 759, 770, 25 L. Ed. 2d 763, 773, 90 S. Ct. 1441, 1448 ("That a guilty plea must be intelligently made is not a requirement that all advice offered by defendant's lawyer withstand retrospective examination in a post-conviction hearing")). Accordingly, after reviewing the record, we agree with the post-conviction court's determination that the defendant was not denied the effective assistance of counsel at the guilt stage of the proceedings.

## B.

### Sentencing proceeding

The defendant also claims that Gagen was constitutionally ineffective at his capital sentencing proceeding. Specifically, the defendant claims that Gagen was incompetent because he (1) failed to investigate and present mitigating evidence at the sentencing hearing; (2) pre-

pared and presented the defendant's case at sentencing in an unreasonable manner; and (3) failed to object to defendant's confessions to uncharged murders on sixth amendment grounds.

We first consider the defendant's claim that Gagen was ineffective for failing to present any mitigation evidence at the sentencing hearing. The defendant claims that there was substantial evidence which could have been presented in mitigation, including evidence that he had a history of drug and alcohol abuse, psychological problems, a low I.Q., a traumatic childhood, and a close relationship with his daughter. The defendant claims that his counsel should have called his grandmother, his mother and his former girlfriend to testify in mitigation. He also argues that defense counsel should have called Cheryl Prost, the psychological consultant, to testify in mitigation that he was remorseful and could be safely managed in a secure institution.

We initially reject the defendant's claim that his counsel was incompetent for failing to present evidence that the defendant had abused alcohol and drugs and often became violent when under the influence of alcohol and drugs. The defendant repeatedly denied that he was under the influence of alcohol or drugs at the time of the offense. (See *Strickland v. Washington* (1984), 466 U.S. 668, 691, 80 L. Ed. 2d 674, 695, 104 S. Ct. 2052, 2066 ("[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements").) Moreover, we agree with the post-conviction court's observation that most juries would not react sympathetically to evidence that the defendant abused drugs and alcohol and might even consider such evidence aggravating, rather than mitigating. See *People v. Henderson* (1990), 142 Ill. 2d 258, 339 (trial judge did not err in characterizing evidence that the defendant's

troubled background led him to be violent as aggravating, rather than mitigating).

The defendant argues that his attorney was ineffective in failing to investigate his history of psychological problems. The defendant claims that evidence was available to prove that he was seen by a psychiatrist as a teenager, was treated for emotional disturbances at two correctional facilities and had a I.Q. which placed him in the "borderline retarded" range. Although Gagen could not recall some of this evidence at the post-conviction hearing, he did testify that he investigated the defendant's mental problems prior to the sentencing hearing. Gagen testified that he requested a psychiatric evaluation of the defendant prior to the sentencing hearing, because the defendant claimed that he heard voices at the time he committed the Wallace murders. The psychiatrist's report indicated that the defendant was sane at the time of the offense and expressed skepticism over the defendant's reported hallucinations. Gagen testified that he never considered calling the psychiatrist as a mitigation witness because the psychiatrist's report refuted any claim that the defendant was insane, had mental problems or experienced hallucinations. Gagen testified that the defendant himself later admitted that he fabricated the part about hearing voices because he thought it "sounded good." Thus, the record establishes that Gagen investigated the defendant's mental and psychological condition and found no evidence which he regarded as mitigating.

The defendant also argues that Gagen was incompetent for failing to call Cheryl Prost, a psychologist employed by the court, to testify in mitigation. Prost testified at the post-conviction hearing that, had she been called as a mitigation witness, she would have testified that she counseled the defendant twice a week for eight months between his guilty plea and sentencing. During

this period, the defendant never denied responsibility for his crimes and posed no security problems. In fact, the defendant was placed in a less secure section of the jail. Prost stated that she never feared for her safety while with the defendant. The defendant argues that Prost should have been called in mitigation to testify that he showed remorse for the murders and that he could be safely confined in a secure institution.

The State responds that Gagen's decision not to call Prost was one of sound trial strategy. Gagen testified that he spoke with Prost prior to the sentencing hearing and reviewed her psychological evaluation report on the defendant. He testified that based upon his past experiences with Prost, both as an attorney and as a judge, he did not believe that she would make a good mitigation witness. After reviewing Prost's testimony at the post-conviction hearing and the content of the psychological evaluation report she filed in the trial court, we cannot conclude that Gagen's decision not to call Prost was unreasonable. Although Prost's psychological report does contain some mitigating information regarding the defendant's remorse and unstable family background, this information was interspersed with details of the defendant's significant criminal history, his lack of interest in education or employment and repeated references to his selfish, impulsive and self-righteous behavior. Prost's testimony at the post-conviction hearing likewise may be construed as both aggravating and mitigating. For example, when asked to describe the defendant's expressions of remorse, Prost stated:

> "[The defendant was] unusual in the respect that he never denied responsibility for what he had done. He understood that what he had done was not just a normal murder. It was an atrocious situation. Even though he came from a very violent background himself and had been involved in a great deal of violence, even that didn't

prepare him for the shock of these types of crimes. He couldn't understand how he could do these types of things that were so hideous.

* * *

The admission that he did a horrible crime, not just an ordinary murder, but a horrible, horrible crime and the fact that he was shocked at the gruesome nature of the crime and wanted to prevent it from ever happening again, to me those were signs of guilt and remorse. I don't judge a person on crying or hysteria as being an indicator of true guilt or remorse."

Prost's repeated references to the horrible nature of the defendant's crimes certainly undermined her value as a mitigation witness. Moreover, as the State points out, Prost never actually stated that the defendant expressed remorse for the crimes. She simply interpreted his candid statements about the crimes as expressions of remorse. Moreover, Gagen may have legitimately believed that it was not necessary to call Prost to testify that the defendant was remorseful, because the defendant planned to testify himself about his feelings of guilt and remorse.

The defendant also claims that his trial counsel was ineffective in failing to call his grandmother, mother, and former girlfriend to testify in mitigation at the sentencing hearing. In support of this claim, the defendant submitted affidavits from these witnesses. The defendant's grandmother, Talmedge Jones, attested that she wanted to testify at the sentencing hearing but was not called by defense counsel. She stated that she would have testified that the defendant had witnessed the murder of his great-grandfather at the age of eight, was seen by a psychiatrist as a teenager, and was easily influenced by his peers. The affidavit of the defendant's girlfriend alleged that the defendant often abused alcohol and drugs. She also testified at the post-conviction hearing that the

defendant was the father of her 14-year-old daughter and visited his daughter when not in prison. The defendant's mother also prepared an affidavit attesting that she would have been willing to testify in mitigation about the defendant's background and that he appeared intoxicated on the day of the crimes. She testified at the post-conviction hearing that the defendant was raised by his grandmother and gave general details about potentially mitigating incidents in his youth.

In addressing the defendant's claim that his counsel was incompetent for failing to call these witnesses to testify in mitigation, we must, of course, "reconstruct the circumstances of counsel's challenged conduct." (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) Defendant's trial counsel testified at the evidentiary hearing that he intended to call three witnesses at the sentencing hearing: the defendant, the defendant's girlfriend and the defendant's grandmother. Counsel stated that he made a strategic decision not to call the defendant's mother as a mitigation witness because she did not participate in the defendant's upbringing and because she had served time in prison. Counsel testified that he intended to call the defendant's grandmother to testify in mitigation about the defendant's background because she had raised the defendant. He stated that he often spoke with the defendant's grandmother about the defendant's case and thought that the jury would like her. He realized, however, that some of the grandmother's testimony would be damaging, because it would reveal that the defendant was difficult to control as a child, had been paroled a short time when the murders occurred, and had hidden the murder weapon in the grandmother's home.

Gagen repeatedly emphasized at the post-conviction hearing that he intended to call the defendant as his primary mitigation witness. He stated that he spent many

hours with the defendant going over his testimony. He believed that the defendant was sincerely remorseful and would make a good mitigation witness.

Ultimately, Gagen called no witnesses to testify in mitigation at the sentencing hearing. Gagen explained at the post-conviction hearing that he decided not to call the defendant's girlfriend in mitigation because she appeared in court wearing a necklace with the word "bitch" clearly visible across the front of it. Gagen stated that he thought the necklace would offend the jury and asked the girlfriend to remove it. When she refused, Gagen decided not to call her to testify. Gagen testified that he did not call the defendant's grandmother to testify because the defendant told him at the sentencing hearing that he did not want her to testify. Gagen claimed that he acquiesced in the defendant's decision because "it was his case." Apparently Gagen still believed, at the time he decided not to call the defendant's grandmother and girlfriend in mitigation, that the defendant himself would offer the most persuasive mitigating testimony. Immediately before Gagen called the defendant to the stand, however, the defendant informed him that he would not testify. The record at the sentencing proceeding establishes that Gagen was surprised by the defendant's refusal and specifically informed the sentencing judge in chambers that the defendant had refused to testify against his advice. The defendant admitted at the post-conviction hearing that he decided not to testify after the State presented evidence in aggravation.

The State claims that Gagen cannot be deemed incompetent for failing to call the defendant's grandmother and girlfriend in mitigation, because Gagen rejected those witnesses at the defendant's urging or for legitimate, strategic reasons. The State claims that the defendant is responsible for the total absence of mitiga-

tion testimony because he refused to testify at the eleventh hour. According to the State, when Gagen found out that the defendant would not testify, it was too late for him to obtain other mitigation witnesses.

We are not entirely persuaded by the State's argument. It is true, of course, that the failure to offer evidence in mitigation at a death penalty hearing is not itself sufficient to demonstrate that a defense attorney was ineffective. (*People v. Steidl* (1991), 142 Ill. 2d 204, 248; *People v. Orange* (1988), 121 Ill. 2d 364, 389; *People v. Shum* (1987), 117 Ill. 2d 317; see also *Strickland v. Washington* (1984), 466 U.S. 668, 698, 80 L. Ed. 2d 695, 700, 104 S. Ct. 2052, 2070; *Burger v. Kemp* (1987), 483 U.S. 776, 97 L. Ed. 2d 638, 107 S. Ct. 3114.) In addition, counsel's decision whether to present a particular witness is generally a strategic choice which cannot support a claim of ineffective assistance of counsel. (*People v. Wright* (1986), 111 Ill. 2d 18; see *People v. Franklin* (1990), 135 Ill. 2d 78, 116-17, quoting *Strickland v. Washington* (1984), 466 U.S. 668, 690, 80 L. Ed. 2d 674, 695, 104 S. Ct. 2052, 2066 ("strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable").) Here, however, Gagen still had an opportunity to call the defendant's girlfriend and grandmother to testify in mitigation at the time the defendant elected not to testify. Although his reasons for rejecting those witnesses were legitimate at the time Gagen believed that the defendant would testify, they ceased to be compelling once Gagen learned that he had absolutely no mitigation evidence without their testimony.

Even if we assume that Gagen was incompetent in failing to call the defendant's girlfriend and grandmother to testify in mitigation, however, we cannot conclude that the defendant suffered prejudice as a result of this alleged deficiency. In assessing the prejudice prong of

the *Strickland* test when a defendant challenges a death sentence, the question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. (*Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.) Given the overwhelming aggravating evidence presented at the sentencing hearing, there is no reasonable probability that the omitted evidence would have changed the jury's conclusion that the aggravating circumstances outweighed the mitigating circumstances. The mitigating evidence which defense counsel failed to introduce would have established that the defendant had witnessed the murder of his great-grandfather when he was eight, had seen a psychiatrist when he was 13 years old, and experimented with drugs and alcohol at an early age. The evidence also would have shown that the defendant had a daughter and family members who cared for him. In contrast, the aggravating evidence established that the defendant instigated the plan to rob the Illinois Cleaners and, during this robbery, shot Samuel Nersesian and Debra Brown twice at point blank range, killing them both. The evidence also proved that the defendant had participated in the murder and armed robbery of Richard Stoltz shortly before robbing the cleaning establishment. Testimony was introduced to show that the defendant killed his victims to prevent them from identifying him as the assailant. The State's evidence also established that the defendant had confessed to the brutal murder of the Wallace couple. As stated, the defendant admitted in his confession that he stabbed Mrs. Wallace repeatedly in the neck, decapitated Mr. Wallace and set their house on fire to destroy any evidence. The defendant stated in his confession that he committed these heinous crimes because he had an argument earlier in the day with his grandmother. The

State's evidence also showed that the defendant had a history of criminal behavior beginning when he was 12 years old and continuing with few interruptions until his arrest for the Brown, Nersesian and Stoltz murders. In view of the nature and extent of the aggravating evidence, the mitigating evidence which the defendant claims was improperly omitted seems rather insignificant indeed. We must conclude that the result of the sentencing proceeding would not have been different, even if counsel had called the defendant's grandmother and girlfriend to testify in mitigation. Accordingly, we hold that defendant's counsel was not constitutionally ineffective in failing to present the omitted mitigating evidence at the sentencing hearing.

We are also unpersuaded by the defendant's claim that he was prejudiced by his counsel's closing argument. The defendant claims that his counsel gave a rambling, unconvincing closing argument which unnecessarily emphasized the gruesome nature of the crimes, the defendant's lengthy criminal record and the fact that he had been recently paroled.

The record does suggest that Gagen could have made a more persuasive closing argument than he did. Nevertheless, in considering claims of ineffective assistance of counsel, "[w]e address not what is prudent or appropriate, but only what is constitutionally compelled." (*United States v. Cronic* (1984), 466 U.S. 648, 665 n.38, 80 L. Ed. 2d 657, 672 n.38, 104 S. Ct. 2039, 2050 n.38.) After carefully reviewing counsel's closing argument, we must conclude that it was not incompetent. (See *People v. Steidl* (1991), 142 Ill. 2d 204, 249; *People v. Caballero* (1989), 126 Ill. 2d 248, 264-65.) While defense counsel referred to the gruesome nature of the victim's injuries, he did so in an effort to persuade the jurors not to allow the nature of those injuries to divert them from the fact that they were being asked to take the defendant's life.

He also emphasized the futility of capital punishment in general as a means of deterring others from committing crimes. He stressed that a sentence of natural life imprisonment was sufficient to protect society from the defendant and to deter the defendant from committing additional crimes. Although counsel commented on the defendant's criminal history and the fact that he had been released on parole, he did so in the context of arguing that the parole board knew of the defendant's background and nevertheless released him from prison. Defense counsel urged the jury to blame the crimes on the parole board that released the defendant into a society where he did not belong.

In addition, as the State points out, once the defendant elected not to testify at the sentencing hearing, Gagen was deprived of what he regarded as his most persuasive argument against the death sentence; that is, the defendant's remorse for the crimes. Gagen repeatedly emphasized that he believed that the defendant's expressions of remorse were sincere and and that he would make a good mitigation witness. Gagen undoubtedly hoped to persuade the jurors in closing that they should spare the defendant's life because he was remorseful. When the defendant refused to testify in mitigation, Gagen's only alternative was to argue about the futility of capital punishment, and to attempt to persuade the jury that a natural life sentence was preferable to a death sentence.

The defendant also claims that his counsel was ineffective for failing to object to introduction of the defendant's confession to the Wallace murders at the sentencing hearing. The defendant argues that the confession was obtained in violation of his sixth amendment right to counsel and that counsel should have moved to suppress the confession. The defendant apparently confessed to the Wallace murders between his guilty plea and the sen-

tencing hearing. Robert Miller, a detective with the St. Clair County sheriff's office testified at the defendant's sentencing hearing that he first met the defendant at the St. Clair county jail in November 1978. After the defendant waived his *Miranda* rights, Miller questioned him about other crimes in the area. According to Miller, the defendant indicated that he knew of three homicides in the area but would not give any details. Ten months later, in September 1979, the defendant asked that Miller be summoned to the jail. When Miller arrived, the defendant handed him a six-page, handwritten confession to the Wallace murders. Miller testified that he did not question the defendant about the confession at that time because he knew nothing about the Wallace murders. After consulting with an officer who knew about the crime, however, Miller met with the defendant and questioned him further. During one of these subsequent interviews, the defendant arranged to have an unidentified female deliver the knife used in the killings, later identified as the victim's knife, to the county jail.

Although the defendant claims that his counsel failed to object to the admission of the Wallace confession, the record does not support this contention. At the outset of the sentencing hearing defendant's counsel made a motion to bar the State from introducing any evidence of other crimes at the death penalty hearing. Defense counsel argued that the statutory provisions which permitted the State to introduce such evidence were unconstitutional in that they allowed the State to prove the commission of another crime by a standard less than proof beyond a reasonable doubt. Defense counsel also argued that the statutory provisions were unconstitutional because they abrogated the rules of evidence in death penalty proceedings. The trial court rejected both of these challenges. When the State attempted to introduce the confession into evidence, defense counsel again objected,

citing possible sixth amendment violations. The trial court admitted the confession into evidence over counsel's objections.

Although it is true that defendant's counsel did not file a written pretrial motion to suppress the confession, it cannot be argued that he did not adequately preserve the sixth amendment claim for appellate review. On direct appeal this court specifically considered whether the defendant's confession to the Wallace murders was obtained in violation of the defendant's right to counsel. After describing the circumstances in which the confession was obtained, this court held that the defendant's constitutional right to counsel had not been violated. Specifically, this court stated:

"Defendant apparently voluntarily and knowingly waived his right to have counsel present at these interviews, and therefore the information obtained pursuant to these interviews cannot be suppressed on the ground that defendant's sixth amendment right to counsel was violated." (*People v. Jones* (1982), 94 Ill. 2d 275, 291.)

Because this court, on direct appeal, considered and rejected the defendant's claim that the Wallace confession was obtained in violation of his sixth amendment right to counsel, we must likewise reject the defendant's claim that his counsel failed to adequately preserve that issue for appellate review.

III

In conclusion, we hold that the defendant was not deprived of the effective assistance of counsel at the plea proceedings or at the capital sentencing proceedings. Because defendant's trial counsel was not constitutionally ineffective, we must also hold that the defendant was not prejudiced by his appellate counsel's failure to challenge the competency of trial counsel on direct appeal. Even if the defendant's appellate counsel had raised the

ineffective-assistance issue on direct appeal, this court would have rejected the claim, as the post-conviction court did here.

For the reasons stated above, the judgment of the circuit court of St. Clair County, denying the defendant's petition for post-conviction relief, is affirmed. The clerk of this court is directed to enter an order setting Wednesday, January 22, 1992, as the date on which the sentence of death entered by the circuit court shall be executed in the manner provided by law. (See Ill. Rev. Stat. 1987, ch. 38, par. 119—5.) A certified copy of the mandate of this court shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*