Andre JONES, Petitioner,

v.

George WELBORN, Warden, and Roland
Burris, Attorney General of Illinois,
Respondents.

No. 92–CV–513–WDS.

United States District Court,
S.D. Illinois.

Dec. 27, 1994.

Howard B. Eisenberg, Little Rock, AR, for petitioner.

Terence M. Madsen, Michael A. Hurst, Asst. Atty. Gen., Chicago, IL, for respondents.

### *MEMORANDUM AND ORDER*

STIEHL, District Judge:

This matter is before the Court on a petition for writ of habeas corpus filed by petitioner pursuant to 28 U.S.C. § 2254. Petitioner is in state custody under two sentences of capital punishment. The record before the Court is extensive, including the petition, answer, briefs and oral argument of the parties, and the transcripts, briefs and complete factual record compiled in the state

court proceedings. The Court now decides the merits of this § 2254 petition.

## I. *BACKGROUND*

On June 8, 1979, petitioner Andre Jones was indicted in the Circuit Court for the Twentieth Judicial Circuit, St. Clair County, Illinois, on three counts of murder, three counts of armed violence, and three counts of armed robbery, stemming from the killings of Richard Stoltz, Samuel Nersesian, and Debra Brown on April 30, 1979. Indicted with Jones was a codefendant, Freddie C. Tiller, Jr. The public defender was appointed to represent both Tiller and petitioner, but was forced to withdraw from representation of petitioner on July 20, 1979, and Robert Gagen was appointed by the state court to represent petitioner.

On August 23, 1979, petitioner withdrew his pleas of not guilty and pleaded guilty to the three murder counts. At the time of his plea, the trial judge advised petitioner of his right to a trial by jury and to confront witnesses; the right to be presumed innocent and the state's obligation to prove him guilty beyond a reasonable doubt; the right to put on a defense and to call witnesses to testify on his behalf; and the rights to remain silent, and to consult with his attorney. (R., Vol. I, C–64 to C–66). In addition, the judge fully apprised petitioner of his possible sentence, including the death penalty. (Vol. I, C–59 to C–64). In fact, the judge stated:

> Also for each one of these murders, if you enter a plea of guilty, I want you to understand that if certain factors are present, you could be sentenced to death, on each one of them.... [I]f the factors which are necessary ... are present, I wouldn't hesitate to sentence you to death. I wouldn't want to. I have never wanted to sentence anybody to death, but I wouldn't hesitate because that would fall under the general covering of part of my duties, carry [sic] out the law in the State of Illinois.

(*Id.* at C–60). Further:

> THE COURT: And I want you to understand, and believe me when I tell you, that I had hoped that this particular chore would never come to me but it does and I won't shirk from my responsibilities. So if there's any thought in your mind that by pleading guilty I might give you natural life, I want to erase that thought from your mind. Because if they prove the factors like in the commission of a felony crime described by the Statute as Armed Robbery being one of them, two murders being another one, I won't hesitate to sentence you to death. You understand that?
>
> THE DEFENDANT: Yes sir.

(*Id.* at C–62–63). The court also explored whether the petitioner had decided to enter his guilty pleas as a result of any improper coercion.

> THE COURT: Has anyone used any threats to get you to come in here and indicate through your attorney that you would enter a plea of guilty, anybody threaten you or said, if you do it we'll let you do this, we'll recommend that. Any kind of promises or threats whatsoever? Did anyone make them to you?
>
> THE DEFENDANT: No sir.

(*Id.* at C–67–68). The judge asked petitioner if he had any questions.

> THE DEFENDANT: Yes, sir. Well, there's one thing, if I understood Mr. Kuehn correctly, he said that the death penalty will be asked for even on a plea of guilty, if I'm not mistaken.
>
> THE COURT: That's correct.
>
> THE DEFENDANT: I understand the natures of the offenses which I have been charged with. That's it sir.

(*Id.* at C–69). The court accepted Jones' pleas of guilty and adjudged him guilty on all three counts. On October 5, 1979, a hearing was held on petitioner's motion to waive the jury for the sentencing. (*Id.*, C–87–93). Petitioner, who took the stand at the hearing, clearly knew of his eligibility for the death penalty, and that without a jury at the sentencing phase, the judge would be imposing the penalty. On October 11, 1979, Gagen moved for a continuance of the sentencing and for a psychiatric examination of petitioner based on a six-page statement which he had made concerning his participation in the slayings of an elderly East St. Louis couple, the Wallaces. The Wallace homicides were unrelated to the charges to which he had

plead. Gagen sought the psychiatric exam because he was concerned about the content of the statement. (*Id.,* C–97). Gagen further indicated that he would be filing a motion in limine to prohibit the state from using the six-page statement. (*Id.,* C–97–98).

Petitioner's sentencing hearing was held on April 14 and 15, 1980, although the record is silent as to the reason for the change to a jury hearing. Defense counsel moved in limine to keep out evidence of plaintiff's confession. (Vol. IV, 16). At the sentencing hearing, the state presented evidence, *inter alia,* of the confession that Jones had given as to the Wallace murders. (Vol. V, 343). Further, extensive evidence was offered as to the Wallace murders by the St. Clair County coroner and East St. Louis police officer John Thurman.

Before the confession was admitted, Gagen objected that reference to the confession would violate petitioner's Sixth Amendment right to counsel. (Vol. V, 401–02). The trial judge overruled the motion on the grounds that petitioner voluntarily gave his confession. Petitioner did not testify at the hearing. Outside the hearing of the jury, the decision not to testify, and the fact that Gagen advised him to testify, were placed on the record. (Vol. V, 411–12).

The jury returned a verdict of death by electrocution on each of the three murder convictions. A direct appeal was taken, and the convictions were affirmed, but the death sentence on the Stoltz murder was vacated, while the other two sentences were affirmed. *People v. Jones,* 94 Ill.2d 275, 68 Ill.Dec. 903, 447 N.E.2d 161 (1982), *cert. denied,* 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983) (*Jones I* ). Petitioner filed two post-conviction petitions in state court, and the St. Clair County Circuit Court held an evidentiary hearing on December 22, 1987, before deciding the second petition. Both petitions were denied, and the denials were affirmed on appeal. *See People v. Jones,* 109 Ill.2d 19, 92 Ill.Dec. 552, 485 N.E.2d 363 (1985), *cert. denied,* 475 U.S. 1090, 106 S.Ct. 1481, 89 L.Ed.2d 735 (1986) (*Jones II* ); *People v. Jones,* 144 Ill.2d 242, 162 Ill.Dec. 15, 579 N.E.2d 829 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3038, 120 L.Ed.2d 906 (1992)

(*Jones III* ). Petitioner then filed his petition for relief under 28 U.S.C. § 2254 in this Court. The petition raises several grounds for habeas relief:

1. Denial of the constitutional right to effective representation of counsel at the plea, sentencing, direct appeal, and first state post-conviction petition.

2. Violation of the Sixth Amendment right to counsel.

3. Section 9–1(e) of the Illinois Death Penalty Statute is invalid for failing to establish a standard for admission of evidence higher than relevance.

4. Certain information admitted during the sentencing hearing violated due process.

## II. *INEFFECTIVE ASSISTANCE OF COUNSEL*

### A. *INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL*

The Sixth Amendment right to counsel guarantees a criminal defendant the right to the effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). Petitioner argues that he was denied the constitutional right to effective assistance of counsel at his plea, sentencing, and appeal. Throughout his plea and sentencing, petitioner was represented by court-appointed counsel, Robert Gagen. The Illinois Supreme Court appointed David Hoffman to represent petitioner on the direct appeal of his sentence. Before examining the merits of petitioner's arguments, the Court will clarify and briefly define petitioner's claims and the applicable standards.

■ The Sixth Amendment right of effective assistance of counsel applies to a criminal defendant's trial, sentencing, and the first appeal of right. *Pennsylvania v. Finley,* 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court articulated a two-part test applicable to ineffective assistance claims: the petitioner must demonstrate (1) his counsel's deficient performance and (2) that counsel's errors were prejudicial. On direct appeal of petitioner's plea and sen-

tence, Hoffman failed to argue that Gagen's representation during the plea and sentencing was constitutionally ineffective. Because Hoffman failed to raise the issue of Gagen's ineffectiveness, the Illinois Supreme Court correctly held that the issue was in default, and barred petitioner from raising the claim. *Jones II,* 92 Ill.Dec. at 554, 485 N.E.2d at 365; *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). As a result, petitioner now claims that Hoffman provided ineffective assistance of appellate counsel. In other words, petitioner must first establish a successful ineffective assistance of appellate counsel claim before he can assert a claim that Gagen's representation at the plea or sentencing was constitutionally ineffective.

■ Hoffman testified at the post-conviction hearing that he believed that petitioner had been deprived of effective assistance of counsel at trial. However, Hoffman concluded that the issue could not be raised on direct appeal because he felt that the record was insufficient to demonstrate prejudice under *Strickland.* Specifically, Hoffman thought that the record lacked the evidence necessary to completely show what mitigating evidence could have been presented at trial. Petitioner argues that Hoffman had no strategic reason for failing to present this issue on direct appeal, and that Hoffman should have known that he could supplement the record with affidavits. Petitioner concludes that Hoffman's misunderstanding of the law constitutes ineffective assistance of counsel. However, petitioner's claim that Hoffman rendered ineffective assistance of appellate counsel also fell into default, because the issue was not raised in the first state post-conviction proceeding. While there is no constitutional right to effective counsel in post-conviction proceedings, *Finley,* 481 U.S. at 555, 107 S.Ct. at 1993, a claim of ineffective assistance of counsel is not waived by an attorney's failure to raise his own ineffectiveness. *People v. Gaines,* 105 Ill.2d 79, 85 Ill.Dec. 269, 473 N.E.2d 868 (1984), *cert. denied,* 471 U.S. 1131, 105 S.Ct. 2666, 86 L.Ed.2d 282 (1985). Because Hoffman also represented petitioner during the first post-conviction motion, he was not required to then raise a claim for his own ineffectiveness during the appeal.

■ The Court must apply the *Strickland* test to petitioner's claim of ineffective assistance of appellate counsel. To summarize, petitioner claims that Hoffman was constitutionally ineffective by failing to raise Gagen's ineffectiveness. Thus, if Gagen's representation at the plea or sentencing was not constitutionally defective, petitioner cannot establish prejudice in his claim against Hoffman, and as a result, cannot establish a claim of ineffective assistance of appellate counsel. To determine whether petitioner was prejudiced by Hoffman's failure to raise Gagen's ineffectiveness on direct appeal, the Court must first decide whether such claims based on Gagen's representation would have been successful. The Court will first examine petitioner's claims of Gagen's ineffective assistance during the plea, and will then turn to the claims concerning Gagen's representation at the sentencing.

### B. *INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL*

#### 1. *Plea Stage*

The two-part *Strickland* test applies to challenges to guilty pleas based on ineffective assistance of counsel. *Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). To establish a successful claim of ineffective assistance of counsel under *Hill* and *Strickland,*

[f]irst, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a

breakdown in the adversary process that renders the result unreliable.

*Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

■ The first prong of the *Strickland* test requires petitioner to show that Gagen's representation fell below an "objective standard of reasonableness." *Id.* at 687–88, 104 S.Ct. at 2064. *Strickland* expressly decried the use of "detailed rules" in judging the reasonableness of counsel's performance. *Id.* at 688, 104 S.Ct. at 2064–65. This analysis must be performed on a case-by-case basis, and the Supreme Court has proclaimed that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689, 104 S.Ct. at 2065. The Court expounded upon this deferential standard of review, stating:

It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case.

*Id.* at 689, 104 S.Ct. at 2065 (citations omitted). The reasonableness of counsel's performance can also be determined or substantially influenced by the defendant's own statements or actions. *Id.* at 691, 104 S.Ct. at 2066–67.

■ To satisfy the second, or prejudice prong of *Strickland* in a claim for ineffective assistance of counsel during a plea, petitioner "must show that there is a reasonable possibility that, but for counsel's errors, he would

not have pleaded guilty and would have insisted on going to trial." *Hill,* 474 U.S. at 59, 106 S.Ct. at 370. Of course, in order to show prejudice, an ineffective assistance claimant must show more than a subjective belief that he would not have pleaded guilty but for counsel's errors. *United States v. Cronic,* 466 U.S. 648, 657 n. 21, 104 S.Ct. 2039, 2046 n. 21, 80 L.Ed.2d 657 (1984) ("It is for this reason that we attach no weight to respondent's ... later expression of dissatisfaction (with counsel's performance).") The *Hill* Court offered guidance in applying the prejudice standard:

In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

474 U.S. at 59, 106 S.Ct. at 370–71. Petitioner must establish both unreasonable performance and prejudice, therefore the Court need not grade the reasonableness of counsel's performance if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice. *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069–70.

■ In examining whether petitioner was prejudiced by Gagen's alleged ineffectiveness, the Court cannot focus "solely on outcome determination," that is, the Court cannot look only to whether the result of the proceedings would have been different but

for counsel's errors. *Lockhart v. Fretwell,* —— U.S. ——, ——, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993). Rather, the prejudice inquiry must also determine whether "the result of the proceeding was fundamentally unfair or unreliable." *Id.* In reversing a finding of ineffective assistance of counsel, the Supreme Court noted that "[t]o set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Id.* at ——, 113 S.Ct. at 843.

▪ Petitioner alleges that Gagen provided ineffective assistance of counsel during the plea stage in many ways: failed to conduct discovery or file written motions; withdrew written motions filed by petitioner's previous counsel; did not conduct investigations into the facts, a possible insanity defense, or petitioner's psychological or drug problems; did not subpoena witnesses; generally failed to prepare for trial; failed to bargain for plea concessions; and by wrongfully encouraging petitioner to plead guilty. Petitioner has offered a litany of ineffective assistance of counsel claims, and the Court will examine these claims individually and by considering the totality of the evidence and circumstances surrounding each claim. *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068–69; *United States ex rel. Simmons v. Gramley,* 915 F.2d 1128 (7th Cir.1990). The Illinois Supreme Court previously decided these claims in *Jones III,* 162 Ill.Dec. at 19–28, 579 N.E.2d at 833–42. However, in this § 2254 action, the Court must independently review the Illinois Supreme Court's rulings on the merits of petitioner's claims, because "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." [1] *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070.

### a. *Failure to File Discovery Requests or Written Motions*

▪ Petitioner asserts that Gagen did not file any discovery requests or written mo-

tions prior to the scheduled trial. Petitioner was initially represented by an assistant public defender, who withdrew on July 20, 1979. The record indicates that shortly after petitioner's arraignment, the assistant public defender filed motions for discovery and the State fully complied with these motions. Gagen did not file any written motions. However, petitioner has not asserted facts or arguments showing that any additional discovery requests or motions would have aided Gagen's representation in any manner. It is incumbent upon petitioner to show that these omissions constituted deficient performance and prejudice. *Hill,* 474 U.S. at 58, 106 S.Ct. at 370. Because petitioner has not shown that filing additional discovery requests or written motions was warranted under the circumstances, or would have caused petitioner to change his plea, neither prong of the *Strickland* standard has been satisfied. *United States v. Brown,* 739 F.2d 1136 (7th Cir.), *cert. denied,* 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 268 (1984).

### b. *Withdrawal of Previously Filed Motions*

▪ Petitioner also argues that Gagen was constitutionally ineffective for withdrawing the motion to suppress filed by the public defender. The motion to suppress filed by the public defender was a pre-printed standardized form, and the only reference to petitioner contained in the motion is that his name is typed as defendant in the caption of the form. The motion does not refer to any of the particular facts surrounding petitioner's case. At the post-conviction hearing, Gagen testified that he talked with petitioner and the officer who took petitioner's statement concerning the April 30, 1979 murders of Richard Stoltz, Samuel Nersesian, and Debra Brown. (R., Vol. VI, 116–18). Gagen withdrew the motion to suppress because he could find no facts to support the motion. (*Id.*) The Sixth Amendment right to counsel

---

**1.** Citing the post-conviction hearing transcript, an affidavit from Talmedge Jones, and other sources, petitioner makes numerous factual arguments as to Gagen's alleged ineffectiveness which often ignore the *Jones III* findings. Factual findings of the state court which are fairly

supported by the record are presumed true. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Because the findings of historical fact related to Gagen's alleged ineffectiveness are fairly supported by the record, the Court upholds these findings.

certainly does not require counsel to argue meritless motions. Petitioner has shown no facts or argument indicating that the statement should have been suppressed, and therefore has failed to show deficient performance or prejudice. *Hill,* 474 U.S. at 57, 106 S.Ct. at 369–70.

### c. *Failure to Investigate Facts and Subpoena Witnesses*

■ Petitioner next contends that Gagen failed to adequately investigate the facts and subpoena witnesses for trial. At the post-conviction evidentiary hearing, Gagen testified that he reviewed the prosecutor's investigative file, and interviewed the policeman who took petitioner's statement, the attorney for petitioner's accomplice in the three murders, Freddie Tiller, Laurie Elam (the woman who accompanied Tiller and petitioner), and the petitioner himself on several occasions. (R., Vol. VI, 94–97, 115, 116, 120–21). The facts surrounding the April 30 murders were not in question, and petitioner had confessed to, and still admits to committing these three murders. Because petitioner has not demonstrated that Gagen was unaware of any material facts, petitioner has not shown deficient performance or prejudice stemming from Gagen's alleged failure to investigate the facts.

■ Petitioner's claim of ineffectiveness based on the failure to subpoena witnesses is also misplaced. Gagen admitted at the post-conviction hearing that he did not subpoena witnesses. (Vol. VI, 120). However, the witnesses Gagen anticipated might testify, petitioner's grandmother, Talmedge Jones, and petitioner's girlfriend, Laurie Elam, agreed to appear voluntarily. (Vol. VI, 143). The choice to avoid the possible intimidating effect of a subpoena, especially where those witnesses agreed to appear, is not ineffective assistance of counsel. *Kubat v. Thieret,* 867 F.2d 351 (7th Cir.), *cert. denied,* 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989). Moreover, petitioner does not identify any witnesses who should have received subpoenas, or how the testimony of such witnesses would have changed his decision to plea. Accordingly, petitioner has failed to establish

either prong of *Strickland* as to the failure to subpoena witnesses.

### d. *Failure to Investigate Available Defenses*

■ Petitioner claims that Gagen's failure to investigate his psychological history, drug problems, or the possibility of an insanity defense prior to entering a guilty plea constitutes ineffective assistance of counsel. On realizing that petitioner could not present an adequate factual defense to the three murders, Gagen considered raising defenses based on insanity and the influence of alcohol or narcotics. (R., Vol. VI, 96–97). However, petitioner informed Gagen that he was not under the influence of alcohol or drugs at the time of the murders (Vol. VI, 96), and Gagen was justified in believing petitioner's statement. Petitioner's own statement dissuaded Gagen from pursuing a defense based on use of alcohol or drugs, therefore, Gagen's failure to pursue such a defense was not objectively unreasonable deficient performance under *Strickland. Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066–67.

■ The Court must still examine whether Gagen provided ineffective assistance of counsel by failing to pursue an insanity defense, or to investigate petitioner's history of psychological and drug abuse problems. Gagen admits that after initially reviewing the overwhelming factual evidence against petitioner, he thought the only possible defenses would be insanity or intoxication, which petitioner had denied. (R., Vol. VI, 96–97). At the time of petitioner's plea, Illinois law permitted an insanity defense where, as a result of a mental defect or disease, the defendant lacked cognition or volition, that is, he could not appreciate the difference between right and wrong (cognition), or could not conform his conduct to the law (volition) at the time of the offense. *People v. Grant,* 71 Ill.2d 551, 17 Ill.Dec. 814, 377 N.E.2d 4 (1978). Gagen testified that he met with petitioner on several occasions, and that petitioner was very cooperative, remorseful, and understood what he had done and the charges against him. (R., Vol. VI, 96, 122–23). Gagen also testified that his interview with Laurie Elam helped to persuade him that petitioner was

sane at the time of the murders. (Vol. VI, 97). Before representing petitioner, Gagen had served as a public defender and as a judge in the criminal division of the St. Clair County Circuit Court. Based on his prior experience, and his interviews with petitioner and Elam, Gagen concluded that he could not present a viable insanity defense. (Vol. VI, 97, 120–23).

Gagen did not request a psychiatric evaluation before petitioner's plea. Immediately after his plea, Cheryl Prost, a psychological consultant to the Twentieth Judicial Circuit of Illinois, conducted a psychological examination of petitioner and filed a four-page report. (Vol. III, C–588). However, shortly after his plea and Prost's evaluation, petitioner confessed to brutally murdering the Wallaces, and attributed the slayings to "voices" that told him to kill. On learning of the confession, Gagen requested the St. Clair County Court to order a psychiatric examination. Pursuant to court order, Dr. Peter Heinbecker, a psychiatrist, examined petitioner on November 30, 1979. (Vol. III, C–608). Petitioner was also examined by a clinical psychologist, Dr. T.J. Fitzgerald, on December 6, 1979. (Vol. III, C–603). Petitioner later informed Gagen that he concocted the story that voices told him to kill the Wallaces because that story "sounded good." (Vol. VI, 103–04).

Various reports contained in the record chronicle petitioner's adolescence and psychological history. Petitioner was raised by his grandmother, Talmedge Jones, and at the age of 9 witnessed the murder of his great-grandfather. (Vol. III, C–594). Petitioner was first committed to the Illinois Department of Corrections when he was 13 years old for an armed robbery. (Vol. III, C–588). While committed to adolescent institutions, he was evaluated and examined by various psychologists. (Vol. III, C–590). After numerous arrests, petitioner was convicted of armed robbery in 1974, and served his sentence on that charge at Menard Correctional Facility until October of 1978. (Vol. III, C–598). While the psychological profiles of petitioner do indicate a long criminal history, no report shows that petitioner suffered from the type of psychological problems leading to

a conclusion that he had been insane at any time.

The reports filed by Prost and Heinbecker refute any contention that petitioner was insane at the time of the murders. Prost concluded her report by stating:

[N]o pathology was found concerning psychosis or mental retardation nor significant substance abuse. What has been found is a very pathological personality disorder which has been present since childhood and which has not changed through the efforts of numerous state penal institutions. Mr. Jones [the defendant] has had poor control over his anger and impulsiveness as well as had little respect for the rights and lives of others.

*Jones III,* 162 Ill.Dec. at 22, 579 N.E.2d at 836.

Heinbecker's summary of petitioner's psychiatric condition opined:

*My diagnostic impression is that of a sociopathic personality.... I tend to be quite skeptical of the reported hallucinations.... It is my opinion that at the time of the crimes charged on April the 10th, 1979, Andre Jones did not lack substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.*

(Vol. III, C–611). These two reports do not support the affirmative defense of insanity, but corroborate Gagen's conclusion that petitioner was not insane at the time of the murders. Nothing in the record suggests that petitioner actually was insane at the time of the crimes.

In order to establish a claim that Gagen's failure to investigate petitioner's psychological background or an insanity defense was ineffective assistance of counsel, petitioner must show deficient performance and prejudice. *Hill,* 474 U.S. at 58, 106 S.Ct. at 370. The *Jones III* court ruled that neither prong of *Strickland* had been satisfied as to this argument. 162 Ill.Dec. at 23, 579 N.E.2d at 837. Under the performance requirement, Gagen "had a duty either to make an investigation or else 'a reasonable decision' that investigation was unnecessary." *Balfour v. Haws,* 892 F.2d 556, 564 (7th Cir.1989), *quot-*

*ing Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. The Seventh Circuit has recognized that where a defendant has no defense available other than diminished capacity, an attorney's failure to investigate could violate the Sixth Amendment. *United States ex rel Rivera v. Franzen,* 794 F.2d 314 (7th Cir.), *cert. denied,* 479 U.S. 991, 107 S.Ct. 588, 93 L.Ed.2d 590 (1986). However, the *Franzen* court also noted that "[t]he Sixth Amendment does not require a defense attorney to pursue defenses that are not reasonably suggested by the apparent factual circumstances surrounding the crime charged or the subsequent demeanor and conduct of the client." *Id.* at 317. Although Gagen realized after initial investigation that an insanity or diminished capacity defense might be the only defense possible, petitioner denied use of alcohol or drugs, and his subsequent demeanor and conduct did not suggest that he was insane at the time of the crime. (R., Vol. VI, 96). Petitioner was cooperative in dealing with Gagen, and expressed remorse for his crimes. (Vol. VI, 96, 122–23). Gagen's interview with Laurie Elam, who was with petitioner shortly before and after the commission of the crimes, also convinced him that an insanity defense was not viable. (Vol. VI, 97). Notably, petitioner's confession to the Wallace murders was taken after the plea, and cannot be considered in grading Gagen's performance. The factual circumstances apparent to Gagen, and petitioner's demeanor and conduct did not suggest the need to pursue an insanity defense. Following the presumption that Gagen's conduct was reasonable professional assistance, petitioner has not demonstrated that *Franzen* and *Balfour* require a finding of deficient performance.

However, even if petitioner could demonstrate deficient performance, "it is easier to dispose of [this] . . . ineffectiveness claim on the ground of lack of sufficient prejudice." *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069. The *Hill* court defined prejudice in the context of a guilty plea as requiring a petitioner to show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." 474 U.S. at 59, 106 S.Ct. at 370. Not surprisingly, petitioner argues that if Gagen had not failed to investigate, he would not have pleaded guilty and would have insisted on going to trial. Citing *United States v. Austin,* 948 F.2d 783 (1st Cir.1991), petitioner contends that Gagen's conduct was prejudicial, because he was induced to enter a guilty plea he would not have otherwise entered. However, the proper inquiry does not turn upon petitioner's "expression of dissatisfaction" with Gagen's representation. *Cronic,* 466 U.S. at 657 n. 21, 104 S.Ct. at 2046 n. 21. Rather, the Court follows the analysis suggested in *Hill* for claims based on counsel's alleged failure to investigate a defense. *See Hill,* 474 U.S. at 59, 106 S.Ct. at 370–71.

█ Because petitioner has alleged that Gagen failed to investigate, the Court's determination of prejudice focuses upon whether the discovery of the information regarding petitioner's psychiatric history and drug use would have led Gagen to change his recommendation to plead guilty. *Id.* The Court must also "predict" whether, assuming Gagen had fully investigated the insanity defense, this "evidence likely would have changed the outcome of a trial." *Id.* The psychiatric reports of Heinbecker and Prost conclude that petitioner was sane at the time of the murders. Nothing in petitioner's lengthy institutional record indicates that he was ever considered legally insane or otherwise incompetent. On the contrary, all petitioner's psychological profiles depict a violent, sociopathic personality. If Gagen would have had petitioner examined prior to his plea, petitioner would have been evaluated as legally sane, and Gagen still would have recommended a guilty plea. Petitioner asserts that insanity was his only defense, and that Gagen also decided that insanity would be the only possible defense after learning the facts of the case. However, Gagen's initial decision that insanity would be the only possible defense did not lend credence to the viability of an insanity defense, but only recognized that absolutely no factual defense existed. Simply stated, no evidence supported the insanity defense. The psychiatric and psychological evaluations of Heinbecker and Prost, and other evidence concerning petitioner's psychological history actually rejected the insanity defense. (See R., Vol.

III). Because petitioner has not demonstrated that he was prejudiced by Gagen's failure to investigate his psychological history, drug abuse, and the insanity defense, his ineffective assistance of counsel claim on these grounds must fail.

### e. *Failure to Negotiate a Plea Agreement*

■ Petitioner claims that Gagen was constitutionally ineffective by allowing petitioner to enter a guilty plea without first negotiating a plea agreement. During the plea proceedings, the State's Attorney remarked:

> Mr. Gagen has talked to me from the outset, I informed Mr. Gagen and this has been for a period of months now that our position was firm that we were not going to dismiss any charges nor were we going to fall short in presenting this case as a death penalty case and seek that penalty against this defendant.

(Vol. I, C–68). Petitioner claims that Gagen did not attempt to negotiate a plea bargain. However, the State's Attorney acknowledged that he and Gagen had discussed the issue, and the statement quoted above clearly establishes that the State's Attorney was absolutely unwilling to negotiate a plea for a sentence of anything other than death. Thus, petitioner has failed to show deficient performance or prejudice on this claim.

### f. *Counsel Coerced Petitioner to Plead Guilty*

Petitioner also claims that Gagen rendered ineffective assistance of counsel by pressuring him into pleading guilty by suggesting that the sentencing judge, St. Clair County Circuit Judge John J. Hoban, would not impose the death penalty. At the December 22, 1987 post-conviction hearing, Laverne Harold, petitioner's mother, and Lavonda Terry, a friend of petitioner's testified that Gagen asked them to talk with petitioner and convince him to plead guilty. (Vol. VI, 20, 35). Terry and Harold testified that Gagen said that petitioner would not receive the death penalty because Judge Hoban owed him a favor. (Vol. VI, 20–21, 35–36). Petitioner testified inconsistently as to whether Gagen had told him that the judge would

inform him at the plea that he could be sentenced to death. (Vol. VI, 72). Petitioner also stated that Gagen told him that he would not receive the death penalty because Judge Hoban owed Gagen a favor. Petitioner asserts that he did not want to plead guilty, but changed his mind at the eleventh hour upon the insistence of his family and Gagen.

Gagen testified at the post-conviction hearing concerning his advice to petitioner and his family. Gagen testified that he informed petitioner that the evidence against him was overwhelming, that the death penalty was a possibility, and that the State's Attorney refused to negotiate a plea bargain. (Vol. VI, 99–101). Gagen stated he advised petitioner of his options, and that petitioner ultimately decided to plead guilty. (Vol. VI, 121–22, 126). Gagen suggested that petitioner waive his right to a jury sentencing hearing, leaving Judge Hoban to sentence him. (Vol. VI, 101–02, 126–27). Gagen thought that if petitioner would plead guilty, waive his right to a jury sentencing, and testify at sentencing showing remorse for the April 30th murders, Judge Hoban would not order the death sentence. (Vol. VI, 126–27). The Court notes that at the time of the plea, petitioner had not confessed to the brutal Wallace slayings, a confession which played a significant role in the sentencing, but did not factor into the decision to plead guilty. Shortly after his plea, petitioner acted on Gagen's advice to waive the jury sentencing and entered a waiver on October 5, 1979. (Vol. I, C–87). Later, petitioner rejected Gagen's advice to waive a jury sentencing hearing, and chose to be sentenced by a jury. (Vol. VI, 127). The record does not refer to a court hearing on petitioner's revocation of the waiver, but Gagen testified that at the time of sentencing "when we got into court . . . he wanted a jury trial." (Vol. VI, 127). While petitioner claims that Gagen boasted that Judge Hoban owed him a favor, Gagen described his rationale concerning Judge Hoban as:

> I thought that if Andre would testify as he had talked to me about the remorse that he had, the fact that he was sorry that this had happened, that I thought that knowing Judge Hoban as I did that I felt that we

had a shot at not getting the death penalty.

(Vol. VI, 127). Gagen also testified that: Well, we had many discussions, and I was very open, I thought [sic] with Mr. Jones, Andre, and told him that I had been a Circuit Judge here in St. Clair County and that for a number of years Judge Hoban [the trial judge] and I had worked very closely together and that I had known Judge Hoban for longer than the period of time that we had served as judges together. In fact, I had been a friend of his family and he of my parents for many years and that I knew that he was personally opposed to the death penalty and I explained to Andre that if we had any kind of chance, if we could give Judge Hoban any reason not to impose the death penalty, I didn't think that he would.

(Vol. VI, 98).

The record also indicates that prior to petitioner's entry of a guilty plea, Judge Hoban informed him of the charges and maximum sentences in accordance with Illinois Supreme Court Rule 402. Judge Hoban specifically informed petitioner that "if there's any thought in your mind that by pleading guilty I might give you natural life, I want you to erase that thought from your mind. Because if they (the State) prove the (aggravation) factors ... I won't hesitate to sentence you to death. You understand that? The Defendant: Yes, sir." (R., Vol. I, C–63). Judge Hoban mentioned the death sentence on three other occasions during the plea proceedings, and petitioner responded that he fully understood the judge's admonitions. (Vol. I, C–60–68). Petitioner also stated that his plea was not a product of any promises, threats, or recommendations. (Vol. I, C–67–68).

■ Where a habeas petitioner enters a plea upon advice of counsel, the voluntariness of that plea hinges upon whether the Sixth Amendment right to effective counsel was satisfied. *Hill,* 474 U.S. at 56, 106 S.Ct. at 369. Thus, to establish a claim that his plea was not voluntary and intelligent, petitioner must satisfy the *Strickland* standard. *Hill,* 474 U.S. at 56–57, 106 S.Ct. at 369–70. Gagen's testimony establishes that his representation satisfied the performance prong of *Strickland.* Gagen believed that if petitioner would waive his right to a jury sentencing and express remorse, Hoban might not order a death sentence, because Gagen believed that Judge Hoban had a personal dislike for the death penalty. The evidence against petitioner was overwhelming, and his chances for acquittal were infinitesimal. The hope of a lesser sentence and the convincing nature of the evidence are recognized factors that suggest the advisability of a guilty plea. Gagen testified that he explained to petitioner his options. Even if Gagen did recommend a plea, such a recommendation was a matter of trial strategy based on the hope for a lesser sentence, or the overwhelming amount of evidence, or both. Unfortunately for petitioner, this strategy was unsuccessful.

Three factors attributable to petitioner collaborated to undermine Gagen's strategy: petitioner refused to waive a jury sentencing, refused to testify at the sentencing, and subsequently confessed to the Wallace murders. Entering a guilty plea and waiving the jury sentencing may have been the strategy most likely to avoid the death penalty. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. At the very least, this strategy was tenable, in consideration of Gagen's belief that Judge Hoban personally disliked the death penalty. However, petitioner's decision to have a jury sentencing removed all discretion from Judge Hoban. Ill.Rev.Stat. ch. 38, § 9–1(g) (1979). Petitioner attacks the strategy that he himself may have destroyed, thus, the reasonableness of Gagen's performance was substantially influenced by petitioner's actions. *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066–67. The Court must avoid examining Gagen's conduct with the benefits of hindsight. *Id.* at 689, 104 S.Ct. at 2065. Following the "presumption that [Gagen's] conduct falls within the wide range of reasonable professional assistance," *id.,* the Court concludes that petitioner has not demonstrated that Gagen's performance was objectively unreasonable or so deficient as to undermine the reliability and fairness of the plea process. *See Lockhart,* —— U.S. at ——, 113 S.Ct. at 842.

■ In addition, petitioner has failed to establish prejudice as to this claim of ineffective assistance of counsel. Judge Hoban and Gagen informed petitioner of the likelihood that a death sentence could be imposed, and petitioner affirmatively stated that his plea was not the product of any promises, threats, or coercion. (R., Vol. I, C–60–68). Therefore, petitioner has failed to establish this claim of ineffective assistance of counsel.

### g. Counsel's Lack of Preparation and Failure to Present a Defense

Petitioner also claims that Gagen was constitutionally ineffective by generally failing to prepare for trial and not preparing any defense to the charges. This claim basically argues that Gagen's general lack of diligence resulted in petitioner having no defense to assert at trial. The Court has previously rejected petitioner's specific allegations of Gagen's neglect. Gagen testified that he had reviewed discovery and had interviewed petitioner, Freddie Tiller's attorney, various police officers, and petitioner's girlfriend and grandmother. (Vol. VI, 94–97, 155–56, 120–21). At the plea proceeding, petitioner answered that he had met with Gagen on approximately six or seven occasions. (Vol. I, C–60). Gagen testified that he was prepared to try petitioner's case even though he may have believed that petitioner would be convicted. (Vol. VI, 121).

To state a successful claim of ineffective assistance, petitioner must demonstrate that Gagen's performance fell outside the presumption of professional reasonable assistance, and that petitioner was prejudiced by Gagen's general lack of preparation. *Strickland*, 466 U.S. at 687–89, 104 S.Ct. at 2064–65. While other counsel may have undertaken petitioner's representation differently, "[t]here are countless ways to provide effective assistance in any given case." *Id.* at 689, 104 S.Ct. at 2065. The Court has rejected the specific claims of neglect, and petitioner has not shown that Gagen's general method of trial preparation constituted deficient performance. To establish that Gagen's general lack of preparation was prejudicial, petitioner must prove that without Gagen's errors, he would not have pleaded guilty. *Hill*, 474

U.S. at 59, 106 S.Ct. at 370–71. In conducting the prejudice inquiry, the Court must ignore petitioner's subjective expressions of dissatisfaction, *Cronic*, 466 U.S. at 657 n. 21, 104 S.Ct. at 2046, and consider factors including whether the correction of counsel's errors likely would have changed the outcome of a trial, *Hill*, 474 U.S. at 59, 106 S.Ct. at 370–71, and whether the "result of the proceeding was fundamentally unfair or unreliable." *Lockhart*, —— U.S. at ——, 113 S.Ct. at 842.

■ Review of the evidence before the Court indicates that petitioner had no viable defense to the crimes charged. Gagen's alleged preparation or lack of preparation does not change the conclusion that no defense existed. Even if Gagen's performance is considered constitutionally deficient, the trial preparation that would have been conducted by objectively reasonable counsel could not have provided a defense for petitioner, so the likely outcome of a trial would not have been different. Petitioner undoubtedly realized that the evidence against him was overwhelming. During the plea proceedings, petitioner was repeatedly informed that the death sentence was a strong possibility and he stated that his plea was voluntary, and was not the result of promises or threats. Therefore, petitioner has failed to demonstrate that his plea was fundamentally unfair or unreliable.

The Court concludes that petitioner has failed to establish that Gagen's counsel during the plea stages was constitutionally ineffective. As noted earlier, petitioner's claim of ineffective assistance of trial counsel stands in procedural default, *Jones II*, 92 Ill.Dec. at 554, 485 N.E.2d at 365; *See Wainwright*, 433 U.S. at 87, 97 S.Ct. at 2506–07, and therefore petitioner must establish ineffective assistance of appellate counsel to cure the procedural default. However, to demonstrate prejudice by ineffective assistance on appeal, petitioner must succeed upon his claim for ineffective assistance of trial counsel.

Because petitioner has failed to prove ineffective assistance during the plea stage, he also cannot establish ineffective assistance of appellate counsel as to his plea. Therefore, petitioner's guilty plea, entered on August

23, 1979, is valid, and the Court **DENIES** petitioner's request to vacate the convictions.

## 2. *Sentencing Stage*

 Petitioner asserts three general arguments that Gagen provided ineffective assistance of counsel during the sentencing proceedings: (a) Gagen failed to investigate and present mitigating evidence when he knew, or should have known that such evidence existed; (b) he failed to move to suppress the Wallace confessions; and (c) he made a rambling, unreasonable, and prejudicial closing argument. Claims of ineffective assistance of counsel during a capital sentencing are also subject to the two-part *Strickland* test. In judging Gagen's performance, the Court must follow the highly deferential presumption that counsel's representation was within the wide range of reasonable professional assistance. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. To establish prejudice as to a sentence, petitioner must establish that "there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

 In *Jones III,* the Illinois Supreme Court rejected the same three general arguments currently before the Court. 162 Ill. Dec. at 28–33, 579 N.E.2d at 842–47. The Court must independently review the Illinois Supreme Court's rulings on the merits of petitioner's claims, because "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070.

### a. *Failure to Present Mitigating Evidence*

Petitioner first asserts that Gagen failed to present mitigating evidence at the sentencing hearing when he knew, or should have known, of such evidence. Petitioner's briefs point to several examples of evidence which could have been introduced: a long history of emotional and psychological problems; low IQ; a violent and traumatic childhood; history of drug and alcohol abuse; that the murders for which he was convicted were committed while under the influence of drugs or alcohol; sincere remorse and guilt; his good behavior while in St. Clair County Jail; and a close relationship with his daughter. No mitigating evidence was presented during the sentencing proceeding. Petitioner asserts that Gagen could have called Laurie Elam, Talmedge Jones, and Cheryl Prost as witnesses.

 The Court rejects petitioner's claims that Gagen should have presented evidence related to drug or alcohol use. As previously noted, petitioner informed Gagen that he was not under the influence of alcohol or drugs at the time of the crimes, and Gagen's actions cannot be considered unreasonable where petitioner denied that he was under the influence of any substance. *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066–67. In addition, evidence of petitioner's past drug and alcohol abuse would more likely be considered aggravating than mitigating, therefore, failure to present such evidence was not deficient performance.

 Petitioner also contends that Gagen was ineffective for failing to investigate his psychological background, which would have produced evidence of his low IQ, violent childhood, and history of emotional and psychological problems. Counsel has a duty either to investigate a defendant's mental history or to make a reasonable decision that investigation was unnecessary. *Balfour v. Haws,* 892 F.2d 556, 564 (7th Cir.1989), *citing Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066–67. As the Illinois Supreme Court found, Gagen did investigate petitioner's mental problems before the sentencing hearing. *Jones III,* 162 Ill.Dec. at 29, 579 N.E.2d at 843. After learning that petitioner's confession to the Wallace murders mentioned hearing voices, Gagen requested a psychiatric examination. The psychiatric report refuted any claim that petitioner was insane, and emphasized his violent sociopathic nature. Gagen also read the report produced

by a court-employed psychologist, Cheryl Prost. While Prost's report includes some mitigating information concerning petitioner's background, the report is filled with information concerning his lengthy criminal record and his selfish, impulsive, and self-righteous behavior. Gagen did investigate petitioner's psychological background, and reasonably concluded that it provided little or no mitigating evidence, and would serve to underscore petitioner's significant criminal history, sociopathic personality, and violent nature.

■ Petitioner also asserts that Gagen was ineffective for failing to call Prost to testify as to petitioner's remorse and that he could be safely managed in an institution. As discussed above, Gagen read Prost's report and spoke with her before concluding that she would not have been a good witness. Gagen was familiar with Prost from his experience as a judge and lawyer, and this experience contributed to his conclusion that she would not have been a good witness. Any assertion by Prost regarding petitioner's good behavior while awaiting the sentencing could have been discredited by evidence of his numerous disciplinary violations while incarcerated at the Menard Correctional Center.

In addition, Gagen's decision not to rely on Prost was made under the assumption that petitioner himself would testify as to his remorse. Gagen felt that petitioner would make a good witness who could testify that he was sorry for his acts, and Gagen planned on him to be the primary mitigation witness. However, just before petitioner was to testify, he informed Gagen that he did not want to testify. Gagen was surprised by petitioner's change of heart, and had the court place petitioner's decision not to testify on the record. Gagen planned that petitioner would establish his own remorse, a reasonable strategy, but petitioner's decision foiled that strategy. *Resnover v. Pearson,* 965 F.2d 1453, 1460 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2935, 124 L.Ed.2d 685 (1993) ("[The defendant] deliberately absented himself from the penalty phase of the trial over the strong protestations of his counsel. [Defendant], who chose not to be present,

cannot now argue that his counsel failed him in the penalty phase of the trial by refusing to introduce evidence in mitigation.").

Gagen also planned to call Laurie Elam and Talmedge Jones as mitigation witnesses. On the day of the sentencing hearing, Elam wore a necklace with the word "bitch" plainly visible across the front of it. When Gagen asked Elam to remove the necklace, she said she would not because petitioner had given it to her. Gagen then decided not to call Elam as a witness. Considering this decision without the benefit of hindsight and under the deferential scrutiny applied to trial strategy by *Strickland,* 466 U.S. at 688–90, 104 S.Ct. at 2064–66, Gagen's decision not to call Elam as a witness was entirely reasonable.

■ Gagen also intended to call Talmedge Jones as a witness. Petitioner lived with Jones during his childhood, and she could have testified as to his family relationships and difficult childhood. However, much of her testimony could have been harmful, because cross-examination could have revealed petitioner's lengthy juvenile record and that he had hidden the gun used in the Nersesian and Brown shootings at her house. However, Gagen thought that Jones was a nice lady and would have jury appeal. Yet, at the same time that petitioner refused to testify, he also refused to let Gagen call Jones as a witness. Where a defendant chooses a particular strategy at trial, he cannot later complain that his own decision forms the basis of an ineffective assistance of counsel claim. *Davis v. Greer,* 13 F.3d 1134, 1139–40 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 328, 130 L.Ed.2d 287 (1994), *citing United States v. Weaver,* 882 F.2d 1128, 1140 (7th Cir.), *cert. denied,* 493 U.S. 968, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989). In *Davis,* the defendant chose not to present mitigating evidence that he committed murder while under the influence of extreme mental or emotional disturbance. 13 F.3d at 1139. Just as the defendant in *Davis* chose not to present this evidence, petitioner decided not to call Jones or to testify himself as to his remorse, difficult childhood, or emotional problems, and his decision cannot form the basis of an ineffective assistance claim. *Id.* at 1139–40; *Resnover,* 965 F.2d at 1460.

Gagen thought that the best way for petitioner to avoid the death penalty was to waive his right to a jury sentencing, and to testify before Judge Hoban that he was remorseful for his acts. From his personal relationship with Hoban, Gagen believed, rightly or wrongly, that if petitioner would have demonstrated sincere remorse, Hoban would have sentenced him to a life term. However, shortly before the sentencing, petitioner withdrew his waiver, and decided to be sentenced by a jury. In the face of overwhelming amounts of damning evidence and a severe lack of mitigation, Gagen planned to have Elam, Jones, and most importantly, petitioner, testify in mitigation. In reliance on this strategy, Gagen made reasonable decisions not to call Prost and Elam, but petitioner forbade Gagen from calling Jones, and decided not to testify. Petitioner's decision helped to undercut Gagen's strategy, and his decisions cannot form the basis of an ineffective assistance claim. *Davis*, 13 F.3d at 1139–40; *Resnover*, 965 F.2d at 1460. Without the anticipated testimony, Gagen pleaded for his client's life, then a reasonable strategy. *See Resnover*, 965 F.2d at 1460. The Court concludes that Gagen's performance fell within the wide range of constitutionally effective assistance.

Even if the Court were to conclude that Gagen's performance fails the first prong of the *Strickland* analysis, petitioner still must demonstrate prejudice. Looking at the purported mitigating evidence in a light favorable to petitioner, the evidence could have shown that petitioner had family members who cared about him, used drugs and alcohol throughout his life, and witnessed the murder of his great-grandfather when he was eight years old. However, any attempt to elicit this evidence would have been countered by additional emphasis on any number of incidents and reports which detailed petitioner's violent criminal nature. The aggravating evidence in this case was simply overwhelming. Along with Freddie Tiller, petitioner robbed and murdered Richard Stoltz on the morning of April 30, 1979. While committing an armed robbery later that day, petitioner murdered, execution-style, Samuel Nersesian and Debra Brown. Petitioner also confessed to the robbery and brutal murders of the Wallaces, admitting that he repeatedly stabbed Mrs. Wallace in her neck, beheaded Mr. Wallace with a butcher knife, and carried the head away from the scene. Several pictures of the various murder victims and crime scenes were introduced into evidence. The State also introduced testimony concerning petitioner's nearly lifelong criminal history. The cumulative effect of this aggravating evidence, in particular the evidence surrounding the Wallace murders, sealed petitioner's fate. As in *Strickland*, "[t]he evidence that [petitioner] says his ... counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented...." 466 U.S. at 699–700, 104 S.Ct. at 2071. Given the overwhelming amount of powerful aggravating evidence, even if petitioner established deficient performance, he has not demonstrated a reasonable probability that the sentencer would have balanced the aggravating and mitigating circumstances differently. In addition, petitioner has not demonstrated that the result of the proceeding was fundamentally unfair or unreliable. *See Lockhart*, —— U.S. at ——, 113 S.Ct. at 842.

### b. *Failure to Object to the Wallace Statement*

Petitioner argues that Gagen's failure to object to the introduction of the Wallace confession violated his right to effective counsel. Initially, the Court notes that Gagen did object to the admission of the Wallace confession on Sixth Amendment grounds, and the trial judge denied the motion. (R., Vol. V, 401–03). On direct appeal, the Illinois Supreme Court denied petitioner's Sixth Amendment argument. *Jones I*, 68 Ill.Dec. at 909–10, 447 N.E.2d at 167–68. However, petitioner also protests that Gagen's objections were oral and generally insufficient, so the Court will examine whether Gagen's objections were so inadequate as to constitute ineffective assistance.

The record reflects that Gagen failed to file any written objection to the Wallace confession, even though the Court requested that constitutional objections be made in writing. (R., Vol. IV, 8). In addition, Gagen

failed to object at several earlier opportunities, and made several ambiguous statements regarding the admissibility of the confession before finally stating his objection. However, during a conference in chambers, Gagen orally objected to the introduction of the Wallace confession on Sixth Amendment grounds. (Vol. V, 401–03). While written objections are preferable, the failure to make a written objection is not per se ineffective assistance.

The *Strickland* Court noted that assessment of the reasonableness of counsel's performance is unnecessary if it is easier to decide an ineffective assistance claim on the grounds of insufficient prejudice. 466 U.S. at 697, 104 S.Ct. at 2069–70. Gagen's oral objection, although ineloquent and lacking legal argument, placed the Sixth Amendment issue before the trial court. The trial court overruled the objection, and its decision was affirmed by the Illinois Supreme Court. *Jones I,* 68 Ill.Dec. at 909–10, 447 N.E.2d at 167–68. As discussed thoroughly in the next section of this order, the *Jones I* court decided that no Sixth Amendment violation occurred, *id.,* and this decision comported with prevailing constitutional interpretation of the time, with the exception of evidence regarding the knife used in the Wallace murders. Therefore, petitioner has not demonstrated that the quality of Gagen's objection to the Wallace confession prejudiced the sentencing determination.

### c. *Gagen's Closing Argument*

■ Finally, petitioner contends that Gagen provided ineffective assistance by making a rambling, unreasonable, and prejudicial closing argument. In reviewing the constitutional effectiveness of Gagen's closing argument, the Court must consider the fact that during the sentencing hearing, petitioner refused to testify or to let his grandmother testify, and that Gagen made an entirely reasonable decision not to call petitioner's girlfriend. Gagen's closing argument focused upon the futility of the death penalty as a deterrent, and argued that a life sentence would prevent petitioner from harming other persons. Gagen's argument referred to the nature of petitioner's crimes, but did

so in the context of asking the jury not to consider the nature of the crimes while emphasizing the value of human life. Gagen's reference to the nature of the crimes could be assessed as a positive tactic; ignoring the nature of the crimes may have destroyed his credibility with the jury. While Gagen's closing argument does not evoke images of a brilliant trial lawyer's elocution, the Court concludes that his argument does satisfy the minimal standards of effective assistance of counsel. In addition, petitioner has not demonstrated that he was prejudiced by Gagen's closing argument.

For the reasons stated above, petitioner has not established ineffective assistance of counsel during the sentencing proceedings. As a result, he also cannot demonstrate ineffective assistance of appellate counsel as to his sentence. Therefore, the Court refuses to vacate petitioner's sentence on the grounds of ineffective assistance of counsel.

### III. *SIXTH AMENDMENT CLAIM*

Petitioner asserts that the admission of evidence related to the gruesome murders of Michael and Dora Wallace at his capital sentencing hearing violated his Sixth Amendment right to counsel. In *Jones I,* the Illinois Supreme Court ruled that petitioner waived any Sixth Amendment right to counsel. *Jones,* 68 Ill.Dec. at 910, 447 N.E.2d at 168. The *Jones III* court ruled that petitioner's counsel was not constitutionally ineffective in failing to properly argue the Sixth Amendment issue. 162 Ill.Dec. at 33, 579 N.E.2d at 847.

Because the state did not raise the issue in its response to the habeas petition, the Court ordered additional briefs and oral argument on the application of the nonretroactivity principles of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) to the Sixth Amendment issues regarding the admission of the Wallace murder evidence at the sentencing hearing. Under *Teague,* new rules of constitutional interpretation are not applied to cases on collateral review unless the rule falls into one of two narrow exceptions to the nonretroactivity rule. Although the *Teague* defense is not jurisdictional and can be waived, the Court enjoys discretion to

entertain the issue. *Caspari v. Bohlen,* — U.S. ——, ——, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994); *Schiro v. Farley,* — U.S. ——, ——, 114 S.Ct. 783, 789, 127 L.Ed.2d 47 (1994). To protect the important policies underlying the finality of state court criminal judgments, and the nonretroactivity principles enunciated in *Teague,* this Court, the initial forum for federal habeas relief, will address the *Teague* issues.

### A. FACTS RELEVANT TO SIXTH AMENDMENT ISSUES

Petitioner entered his plea of guilty to the Stoltz, Nersesian, and Brown murders on August 23, 1979. As discussed above, Robert Gagen represented petitioner at his plea. On August 30, 1979, Detective Robert Miller of the St. Clair County Sheriff's Office interviewed Freddie Tiller, petitioner's accomplice in the three murders, to inquire whether Tiller knew about other unsolved crimes in the area. Tiller mentioned that petitioner might have been involved in some other crimes. That same day, August 30, 1979, Detective Miller interviewed petitioner at the St. Clair County Jail. Miller read petitioner his *Miranda* rights and accepted a written waiver before beginning the conversation, and the two then spoke generally about other crimes in the area. Miller testified that the conversation lasted from one and a half to two hours, and petitioner said that the only time he had been caught committing a crime, he had been identified by a victim or witness, and while in the penitentiary, he decided to destroy anyone who witnessed him committing a crime in the future. (R., Vol. V, 373–75). At this particular meeting, petitioner indicated that he knew of three homicides in the area, but did not discuss any other circumstances surrounding the homicides. The conversation ended without mention of the Wallace murders.

Two days later, on September 1, 1979,[2] petitioner asked to see Detective Miller. Miller met petitioner at the jail, and petitioner handed him a six-page written confession to the November 1978 murders of Michael and Dora Wallace. Because Miller knew little about the Wallace homicides, he did not question petitioner at that time, and left the jail without speaking to petitioner about the Wallace murders. After learning some details about the Wallace murders from a fellow detective, Miller returned to the jail on more than one occasion to ask petitioner about the murders. Petitioner's conversations with Miller corroborated his earlier confession, as he exhibited specific knowledge concerning various details of the murder scene. Petitioner also arranged to have an unidentified female deliver to Miller the butcher knife used in the murder, and this knife was later identified as belonging to the Wallaces.

Because petitioner contends his Sixth Amendment right to counsel was violated, it is important to identify exactly what is and is not known about the meetings between Miller and petitioner. The initial meeting occurred on August 30, 1979, seven days after petitioner pleaded guilty to three murders. The record clearly establishes that Miller initiated the first conversation, petitioner signed a *Miranda* waiver, and no details of any crimes were discussed or inquired about at that time. *Jones I,* 68 Ill.Dec. at 910, 447 N.E.2d at 168. Petitioner initiated the next exchange by calling Miller back to the jail two days later and handing him the Wallace confession. As to the conversations occurring after petitioner offered the confession, the record does not establish that petitioner was informed of his constitutional right to counsel at any of the meetings. Likewise, the record is not clear as to when the additional details were elicited from petitioner;

---

**2.** The Court presumes that the factual findings of the Illinois Supreme Court decisions are true. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). However, the presumption of correctness in this habeas action applies only if the facts are fairly supported by the record. *Id.;* 28 U.S.C. § 2254(d). In *Jones I,* the Illinois Supreme Court correctly found that the first interview with Miller occurred on August 30, 1979. 68 Ill.Dec. at 909, 447 N.E.2d at 167. In *Jones*

*III,* the court found that the first meeting occurred in November 1978, approximately five months before the Wallace murders, and ten months before petitioner confessed to the Wallace murders. 579 N.E.2d at 846. This discrepancy in the facts is critical to the Sixth Amendment claim. Because the record plainly indicates that Miller first questioned petitioner on August 30, 1979, the Court disregards the inconsistent factual finding of the *Jones III* court.

the record states only that the two met "a couple of times after that concerning the statement." (R., Vol. V, 377). Miller never contacted Gagen about the confession or his conversations with petitioner, and petitioner did not engage in these conversations under the advice of counsel.

## B. THE TEAGUE V. LANE STANDARD

▮ The Supreme Court has articulated a three-step analysis to determine whether *Teague* forecloses habeas relief to a state prisoner. *Caspari,* —— U.S. at ——, 114 S.Ct. at 953. First, the Court must ascertain the date on which petitioner's conviction and sentence became final for *Teague* purposes. *Id.* Second, the Court must determine whether petitioner seeks application of a "new rule," a result " 'not *dictated* by precedent existing at the time the defendant's conviction became final.' " *Id., quoting Teague,* 489 U.S. at 301, 109 S.Ct. at 1070. Finally, if the petitioner invokes a new rule, the Court must determine whether that rule falls within one of two narrow exceptions to the nonretroactivity principle. *Caspari,* —— U.S. at ——, 114 S.Ct. at 953.

Petitioner claims that all of the evidence related to the Wallace murders was secured in violation of his Sixth Amendment rights. For purposes of analytical clarity, the Court will divide the communications between petitioner and Detective Miller into three groups: first, the initial August 30 conversation; second, the September 1 encounter where petitioner gave Miller the handwritten confession; and third, the subsequent conversations between Miller and petitioner. The Court will then conduct a *Teague* analysis as to each group of communications to determine whether any of the elicited statements violated the Sixth Amendment. After resolving whether any of the statements were secured in violation of the Sixth Amendment, the Court will examine the evidence introduced at the sentencing to determine whether introduction of that evidence violated petitioner's Sixth Amendment rights.

## 1. Finality of Petitioner's Conviction

▮ The conviction and sentence imposed by a state court becomes final for purposes of retroactivity analysis when the availability of direct appeal to a state court has expired, and the time for filing a petition for certiorari has elapsed or the petition has been finally denied. *Id.* Petitioner's conviction and sentence became final on October 17, 1983, upon the United States Supreme Court's denial of his petition for certiorari.

## 2. Does Petitioner Seek The Benefit Of A New Rule?

▮ In *Teague,* the Supreme Court defined a new rule as a rule which "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "*dictated* by precedent existing at the time the defendant's conviction became final." *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070. A decision undoubtedly creates a new rule when it expressly overrules a prior decision, but where a decision only extends the reasoning of prior cases, the new rule inquiry becomes much more difficult. *Graham v. Collins,* —— U.S. ——, ——, 113 S.Ct. 892, 897, 122 L.Ed.2d 260 (1993); *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990). In such difficult cases, courts must apply *Teague* in light of the primary purpose of federal habeas review, that is, to ensure proceedings in accordance with the Constitution as interpreted at the time of the proceedings. *Graham,* —— U.S. at ——, 113 S.Ct. at 897–98; *Saffle,* 494 U.S. at 488, 110 S.Ct. at 1260. Thus, the new rule principle "validates reasonable, good-faith interpretations of existing precedents made by state courts even ... [if] they are shown to be contrary to later decisions." *Saffle,* 494 U.S. at 488, 110 S.Ct. at 1260. Under this view of what constitutes a new rule, the Court must determine whether, on October 17, 1983, a court "would have felt compelled by existing precedent to conclude that the rule ... [petitioner] seeks was required by the Constitution." *Id.*

Petitioner contends that the result he seeks does not require creation of a new rule. Relying on a seminal Sixth Amendment case, *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and subsequent interpretations in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424

(1977); *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); and *Estelle v. Smith,* 451 U.S. 454, 469–71, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), petitioner concludes that at the time his conviction and sentence became final, prophylactic exclusionary rules specifically applied to statements obtained from a defendant which were used, not to prove guilt, but for the purposes of aggravation at a capital sentencing hearing. Petitioner contends that under these rules, each of the conversations with Miller violated his Sixth Amendment rights, and as a result, introduction of evidence regarding the Wallace murders was constitutional error requiring the Court to vacate his sentence.

*Brewer* and *Estelle*[3] provide the strongest support for petitioner's position. In *Brewer,* the defendant, after arraignment and while represented by counsel, was interrogated by police officers during a 160–mile car ride, despite his "express and implicit assertions of his right to counsel." 430 U.S. at 405, 97 S.Ct. at 1243. Although the officers had been warned against, and had even agreed with defendant's counsel not to question him, the interrogating officers did not inform the defendant of his right to counsel, and "made no effort at all" to learn whether the defendant wished to relinquish that right. *Id.* The *Brewer* Court ruled that the defendant did not waive his right to counsel, and introduction of evidence derived from these statements violated the defendant's Sixth Amendment rights. *Id.* at 404–06, 97 S.Ct. at 1242–44. Petitioner contends that the *Brewer* Court rejected essentially the same argument the State offers in this case, that is, that the defendant knew his rights and that he had counsel, but made a voluntary statement, which resulted in a lawful interrogation. *See id.*

The *Estelle* decision is more supportive of petitioner's position because the case is more factually akin. In *Estelle,* a state-employed psychiatrist examined the defendant to determine his competency to stand trial without advising the defendant of his right to counsel, or notifying his attorney. 451 U.S. at 457–

60, 101 S.Ct. at 1870–72. At the capital sentencing hearing, the psychiatrist offered strong opinions regarding the defendant's future dangerousness, a key issue in the sentencing, based upon statements and information learned during the examination, and the defendant was sentenced to death. *Id.* at 459–60, 101 S.Ct. at 1871–72. After ruling that the psychiatrist's opinion was secured in violation of the defendant's *Miranda* rights, the Court also held that the interview violated the Sixth Amendment right to counsel. *Id.* at 470–71, 101 S.Ct. at 1876–77. Petitioner asserts that under *Estelle,* the *Massiah* line of Sixth Amendment cases definitely applies to capital sentencing hearings at which a witness testifies in aggravation.

To determine whether petitioner seeks the benefit of a new rule, the Court must "survey the legal landscape" as it existed in 1983, and decide if, in October 1983, Sixth Amendment jurisprudence compelled a finding that introduction of the Wallace murder evidence was constitutional error. *Saffle,* 494 U.S. at 488, 110 S.Ct. at 1260. The State attempts to distinguish *Estelle* on the grounds that in the instant case, the purpose of the initial interview was to inquire about unresolved crimes, not to secure evidence to be used at the sentencing. The State misreads *Estelle,* as in that case, the purported purpose of the initial interview was to determine the defendant's competency, 451 U.S. at 457–59, 101 S.Ct. at 1870–71, thus, the purpose of the interview does not distinguish *Estelle.*

However, both *Brewer* and *Estelle* discussed the issue of waiver of the Sixth Amendment right to counsel. *Estelle,* 451 U.S. at 471 n. 16, 101 S.Ct. at 1877 n. 16; *Brewer,* 430 U.S. at 405–06, 97 S.Ct. at 1242–44. Both opinions quoted from *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), the prevailing rule that waiver of the right to counsel "must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends ... upon the particular facts and circumstances surrounding each

---

**3.** *Estelle* rested on Fifth and Sixth Amendment grounds, but this Court focuses only upon the Sixth Amendment right to counsel.

case...." (as quoted in *Estelle,* 451 U.S. at 471 n. 16, 101 S.Ct. at 1877 n. 16). Both decisions ruled that the defendant could have waived his right to counsel, but that waiver had not been demonstrated in either case. *Estelle,* 451 U.S. at 471 n. 16, 101 S.Ct. at 1877 n. 16; *Brewer,* 430 U.S. at 405–06, 97 S.Ct. at 1242–44. In *Estelle,* the Court stated that "[w]e do not hold that respondent was precluded from waiving this constitutional right.... [However], [n]o such waiver has been shown, or even alleged here." 451 U.S. at 471 n. 16, 101 S.Ct. at 1877 n. 16.

In *Jones I,* the Illinois Supreme Court applied the knowing and intelligent waiver standard in ruling that petitioner waived his Sixth Amendment right to counsel. 68 Ill. Dec. at 910, 447 N.E.2d at 168. Clearly, the Sixth Amendment, as interpreted in October 1983, allowed petitioner to make a knowing and intelligent waiver of his right to counsel, even where police initiated the conversation. *See Estelle,* 451 U.S. at 470–71, 101 S.Ct. at 1876–77; *Brewer,* 430 U.S. at 405–06, 97 S.Ct. at 1242–44. Upon examination of the factual record concerning the three groups of statements, the Court concludes that the law, as it existed in October 1983, only compelled a court to find that the third group of statements were secured in violation of petitioner's Sixth Amendment rights.

■■■ The first conversation, initiated by Detective Miller on August 30, revealed no information concerning the Wallace murders. Notably, petitioner signed a *Miranda* waiver before this conversation. Petitioner initiated the second contact on September 1 by calling Miller to the jail and handing him the confession. The state court emphasized that petitioner was familiar with criminal proceedings and was informed of his right to counsel prior to talking with Miller. *Jones I,* 68 Ill.Dec. at 910, 447 N.E.2d at 168. His participation in the first two contacts was unquestionably voluntary, unlike *Brewer,* as petitioner even initiated the September 1 meeting by asking that Miller be sent to the jail, where he handed the detective a completed handwritten confession. In October 1983, the State maintained the burden to prove a knowing, voluntary, and intelligent waiver, and courts were to engage in every reason-

able presumption against waiver. *Brewer,* 430 U.S. at 404, 97 S.Ct. at 1242. In light of the factual record and the state of the law in October 1983, a reviewing court would not have been compelled by precedent to rule that the first two groups of statements violated the Sixth Amendment.

However, the factual record surrounding the third group of statements is markedly different. The record is ambiguous as to how many meetings were held between Miller and petitioner after Miller received the confession. The record is devoid of any indication that petitioner was informed of his rights at any of these meetings, or that petitioner initiated any of these meetings. Although petitioner knew that he had a right to, and had counsel, the State did not satisfy the burden of proving a valid waiver of counsel as to any meeting after the September 1 contact where petitioner offered his confession. In light of the factual record and the state of the law in October 1983, a reviewing court would have been compelled by precedent to rule that the third group of statements violated the Sixth Amendment.

In his original brief supporting his habeas petition, petitioner cited numerous cases decided after 1983 in arguing that all of the contacts violated his right to counsel. *See Patterson v. Illinois,* 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988); *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); and *Illinois v. Kidd,* 129 Ill.2d 432, 136 Ill.Dec. 18, 544 N.E.2d 704 (1989). Under these cases, where police initiate interrogation and the defendant has an existing attorney/client relationship, any waiver of rights is invalid for that police-initiated interrogation. *See Patterson,* 487 U.S. at 290–91, 108 S.Ct. at 2393–94; *Jackson,* 475 U.S. at 636, 106 S.Ct. at 1411. Thus, petitioner asserts that the police-initiated August 30 meeting violated his right to counsel, and as a result, the September 1 confession was tainted fruit of the first conversation, thereby violating his right to counsel.

While the Supreme Court's holdings in *Jackson* and *Moulton,* and the Illinois Supreme Court holding in *Kidd* are rooted in

Sixth Amendment cases decided before October 1983, these holdings unquestionably extended the reasoning of prior cases such as *Brewer* and *Estelle.* The Supreme Court has similarly ruled that *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), which extended *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) was a new rule for purposes of *Teague. Butler v. McKellar,* 494 U.S. 407, 414–15, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990) ("[T]he fact that a court says that its decision is within the 'logical compass' of an earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' under *Teague.*"). *See also Bunch v. Thompson,* 949 F.2d 1354 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3056, 120 L.Ed.2d 922 (1992). *Butler* held that *Roberson* extended *Edwards* so as to constitute a new rule; this Court concludes that the post–1983 Sixth Amendment cases extended the right to counsel to an even greater degree than the extension of *Edwards* by *Roberson.* Therefore, upon survey of the legal landscape as it existed in October 1983, a reviewing court was not compelled by existing precedent to conclude that the rule petitioner sought was required by the Constitution, and as a result, petitioner seeks the benefit of a new rule. *See Henderson v. Singletary,* 968 F.2d 1070, 1073 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 621, 121 L.Ed.2d 554 (1992); *Stokes v. Singletary,* 952 F.2d 1567, 1579 n. 12 (11th Cir.1992); *Collins v. Zant,* 892 F.2d 1502, 1510–12 (11th Cir.), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 180 (1990) (these three cases ruled that *Jackson* is a new rule barred by *Teague* ). *See also Montoya v. Collins,* 955 F.2d 279, 283–84 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 820, 121 L.Ed.2d 692 (1992) (extension of *Jackson* would be a new rule).

### 3. *Exceptions To The Teague Bar*

Under *Teague,* new rules can be applied retroactively to grant habeas relief only if they fall within one of two narrow exceptions. *Saffle,* 494 U.S. at 486, 110 S.Ct. at 1259. The first exception protects new rules which place an entire category of conduct beyond the reach of the law, or prohibit imposition of a type of penalty for a class of defendants because of their status or offense. *Sawyer,* 497 U.S. at 241, 110 S.Ct. at 2830–31. Petitioner does not contend that this exception applies, and it clearly does not.

The second exception has two elements which must be satisfied to exempt the new rule from the *Teague* bar. First, the new rule must be a "watershed rule of criminal procedure" which "alter[s] our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding." *Sawyer,* 497 U.S. at 241–42, 110 S.Ct. at 2831 (citations omitted). Second, the new rule must improve the accuracy and fairness of the judgment. *Id.* While the precise contours of this exception are difficult to define, the Supreme Court has repeatedly noted that it is intended to apply only to a "small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty." *Graham,* —— U.S. at ——, 113 S.Ct. at 903. The scope of the *Teague* exceptions must accord with the recognition that " 'application of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system.' " *Sawyer,* 497 U.S. at 242, 110 S.Ct. at 2831, *quoting Teague,* 489 U.S. at 309, 109 S.Ct. at 1074.

In recognizing that few new rules could possibly fall within the second exception, the Supreme Court has often cited *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), which conferred the right to be represented by counsel in all criminal trials for serious offenses, to illustrate the extraordinary type of rule falling within the exception. *See Saffle,* 494 U.S. at 495, 110 S.Ct. at 1263–64. Petitioner seizes upon this example, arguing that the Sixth Amendment rule involved in the instant case is a bedrock procedural element, just as is the broad right to counsel originated in *Gideon.* This argument stretches the *Gideon* example too far. In citing *Gideon* as an example, the Court did not indicate that all cases expanding Sixth Amendment rights fall within the exception; instead, the Court meant that only truly groundbreaking cases, such as *Gideon,*

are exempt. The new rules stemming from *Patterson, Jackson, Moulton,* and *Kidd* do not have the "primacy and centrality of the rule adopted in *Gideon,* ..." and thus, are not watershed bedrock new rules. *Saffle,* 494 U.S. at 495, 110 S.Ct. at 1263–64.

■ Petitioner argues that the factual record demonstrates potential inaccuracies surrounding the confession, thus leading to the conclusion that the rule he seeks would improve the fairness, accuracy, and reliability of sentencing procedures. This Court believes that the proper inquiry should not focus only upon the facts of this case, but whether the purported rule would so improve sentencing procedures as to qualify as an exception to the *Teague* bar. Several courts have rejected the assertion that new rules effecting extensions of the right to counsel are the type of extraordinary improvements in fairness and accuracy necessary to fall within the second exception, and this Court agrees. *See Butler,* 494 U.S. at 416, 110 S.Ct. at 1218; *Henderson,* 968 F.2d at 1073, citing *Collins,* 892 F.2d at 1512.

### C. DID ANY EVIDENCE INTRODUCED AT THE SENTENCING HEARING VIOLATE PETITIONER'S SIXTH AMENDMENT RIGHTS?

Various evidence related to the Wallace murders was introduced at petitioner's sentencing hearing. Detective Miller, St. Clair County Coroner James D. Radden, East St. Louis policeman John Thurman, and Richard and Joan Wallace, children of the deceased, testified regarding the Wallace murders. Petitioner's confession was read into evidence. The knife used in the murders was admitted into evidence, and several gruesome photographs of the Wallaces' bodies and the murder scene were published to the sentencing jury.

■ After applying the *Teague* nonretroactivity rule, the Court concludes that only the third group of statements, the conversations between Miller and petitioner occurring after the September 1 confession, violated petitioner's Sixth Amendment rights. Thus, the Court must determine whether any of the evidence introduced at the sentencing was the product of the unlawful conversations between Miller and petitioner after the September 1 confession. Evidence derived from the first and second groups of statements, the August 30 meeting and the September 1 confession, did not violate the Sixth Amendment.

Nearly all of the evidence introduced at the sentencing was a product of petitioner's confession, and not the post-confession statements. The photographs of the Wallaces' bodies and the murder scene were not products of petitioner's post-confession statements. Testimony of Miller, Thurman, Radden, and the Wallaces' two children was not the product of the post-confession statements, with one exception: Richard Wallace identified the knife used to kill his parents as one owned by his father, and the knife was admitted into evidence. The East St. Louis police located the knife as a result of petitioner's post-confession statements, as petitioner arranged to have an unidentified woman deliver the knife to the jail. *Jones I,* 68 Ill.Dec. at 910, 447 N.E.2d at 168. Because petitioner's post-confession statements led to admission of the knife into evidence, admission of the knife and testimony concerning the knife violated the Sixth Amendment. However, the remainder of the evidence introduced at the sentencing hearing was not a product of the post-confession statements, and therefore, did not violate petitioner's Sixth Amendment rights.

■ While admission of evidence regarding the knife violated petitioner's Sixth Amendment rights, the improper admission entitles him to habeas relief only if the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993), quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). In consideration of the overwhelming amount of aggravating evidence presented at the sentencing, the Court concludes that introduction of the knife and evidence regarding the knife was not prejudicial, and does not require the Court to vacate petitioner's sentence.

## IV. PETITIONER'S OTHER CHALLENGES TO HIS SENTENCE

While petitioner's briefing efforts in this case are limited to the ineffective assistance and Sixth Amendment issues discussed above, his § 2254 petition lists two other grounds for relief. Each of these arguments was rejected in *Jones I*, 68 Ill.Dec. at 907–09, 447 N.E.2d at 165–67; petitioner has incorporated his briefs from the direct appeal of his conviction and sentence.

First petitioner asserts that Section 9–1(e) of the Illinois death penalty statute, Ill.Rev.Stat. ch. 38, ¶ 9–1(e) (1979), is unconstitutional for failing to establish any standard except relevance for the admission of information during the second phase of the sentencing proceeding. At the time of petitioner's sentence, the death penalty statute provided that "[a]ny information relevant to any additional aggravating or any mitigating factors indicated in Subsection (c) may be presented by the State or defendant regardless of its admissibility under the rules governing the admission of evidence at criminal trials." Ill.Rev.Stat. ch. 38, ¶ 9–1(e). The Seventh Circuit has previously denied arguments that the death penalty statute is unconstitutional because it allegedly fails to ensure that all factors relied upon by the prosecution are relevant and constitutionally permissible. *Williams v. Chrans*, 945 F.2d 926, 939 (7th Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992); *Silagy v. Peters*, 905 F.2d 986, 1000–01 (7th Cir.1990), *cert. denied*, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). In each case, the Seventh Circuit held that "the jury's discretion at the selection stage of the sentencing hearing is focused on that which is 'relevant' to the task at hand." *Williams*, 945 F.2d at 939, *quoting Silagy*, 905 F.2d at 1000. *See also Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983). In light of controlling precedent rejecting petitioner's contention, the Court declines to vacate petitioner's sentence on this ground.

Second, petitioner asserts that various hearsay information was admitted during the sentencing hearing in violation of due process, including a hearsay declaration of a police detective which identified a revolver as the murder weapon in the Stoltz, Nersesian, and Brown murders, and hearsay declarations regarding past misconduct which were included in a presentence report. None of petitioner's briefs develops, or even cites any cases on this issue, so it is difficult to assess petitioner's argument beyond the general assertion that introduction of the hearsay evidence violated due process.

Courts have long sanctioned the use of hearsay evidence in sentencing proceedings, and capital cases are no exception. *Del Vecchio v. Illinois Dep't of Corrections*, 31 F.3d 1363, 1387–88 (7th Cir.1994). The Constitution relaxes hearsay rules during sentencings "to expand the deposit of information available to the sentencing tribunal." *Id.* at 1388. However, a criminal defendant enjoys a due process right to be sentenced on the basis of reliable information, and as a result, is entitled to a reasonable opportunity to rebut contested hearsay, and any contested hearsay admitted must be reliable. *United States v. Johnson*, 997 F.2d 248, 254 (7th Cir.1993). The hearsay involved was reliable, as information regarding the gun was acquired from a policeman and from petitioner's confession. Petitioner does not specify what aspects of his presentence report were unreliable, and the Court finds that the information was reliable. Petitioner also received reasonable opportunities to challenge and rebut the contested hearsay. Only where the defendant demonstrates "'that the information before the Court was inaccurate, and that the Court relied on it' can the defendant successfully challenge his sentence." *Id.*, *quoting United States v. Musa*, 946 F.2d 1297, 1306 (7th Cir.1991). Petitioner has not demonstrated either factor; therefore, the Court declines to vacate his sentence on this ground.

Upon review of the record before the Court, including the petition, answer, briefs, and transcript and record of the state court proceedings, and having heard oral argument, the Court finds that an evidentiary hearing is not necessary. The Court **DISMISSES** petitioner's petition for writ of habeas corpus. The Court further **DENIES** the application for interim attorney's fees

submitted by petitioner's counsel, but suggests that petitioner's counsel submit a final application for attorney's fees.

**IT IS SO ORDERED.**